THE INDIANA IRON COMPANY *v.* CRAY, BY NEXT FRIEND.

[No. 2,222.   Filed Dec. 10, 1897.   Rehearing denied March 15, 1898.]

MASTER AND SERVANT. — *Negligence.* — *Complaint.* —Where a complaint for damages for personal injuries caused by the negligence of the master is based upon the theory that the contractual relation of master and servant existed between plaintiff and the defendant, the existence of such relation is a material element of the cause of action, and plaintiff must recover upon such theory or not at all. *pp. 576, 577.*

SAME.—*Independent Contractor.*—An independent contractor is not, in a legal sense, a servant of his employer, but is a person exercising an independent employment under a contract to do certain work by his own methods, without subjection to the control of his employer, except as to the product or result of the work.   *p. 577.*

SAME.—*Independent Contractor.*—A person engaged in an iron mill, employing his own assistants and receiving a stipulated price per ton for the products passing through his hands, the factory and all of its machinery being under the control and management of his employer who furnished a superintendent, master mechanic, boss carpenter and engineer to operate the machinery and keep the building and machinery in repair, is not an independent contractor, but rather a foreman, and the relation of master and servant exists between such assistants employed by him and the proprietor of the factory.   *pp. 577-582.*

SAME.—*Duty of Master to Furnish Safe Place to Work.*—The duty of the master to furnish his servant a reasonably safe place to work

cannot be evaded by delegating to an officer or servant the preparation of the place or the inspection and repairs of the premises. *p. 582.*

MASTER AND SERVANT.—*Knowledge of Danger.*—*Inspection of Appliances.*— Where a servant who discovered an apparent dangerous condition of a portion of the building in which he was required to work, caused an inspection thereof to be made by one whose duty it was to make such inspection, he had a right to rely upon such inspection, and the master was liable for the danger resulting therefrom after being notified thereof. *p. 582.*

SPECIAL VERDICT.—*Interrogatories to Jury.*—*Damages.*—Where in an action for personal injuries the jury in answer to one interrogatory inquiring as to the amount of damages sustained by plaintiff as the direct and immediate result of the injury answered $480.00, and in answer to another interrogatory assessed the amount of damages at $2,750.00, there was no inconsistency, as it will be presumed that the jury understood the language of the interrogatories in their popular or ordinary meaning to be that the former referred to immediate damages, and the latter included also damages which arose from more remote and indirect consequences. *p. 583*

From the Delaware Circuit Court. *Affirmed.*

*Ryan & Thompson,* for appellant.

*M. E. Forkner* and *J. N. Templer & Son,* for appellee.

BLACK, J.—The appellee brought his action against the appellant for the recovery of damages for a personal injury alleged to have been caused through the negligence of the appellant without the fault of the appellee, while he was working in the appellant's manufactory as its employe. There was a special verdict, upon which judgment was rendered for the appellee for $2,750.00, and it is contended, under an assignment of error to that effect, that the court erred in overruling the appellant's motion for judgment in its favor on the verdict. The special verdict was very lengthy, and consisted of two sets of interrogatories with the answers thereto. It was in substance found that the appellee was injured on the 23d of March, 1895, while working in a manufacturing

plant then, and for about three years before, owned and operated by the appellant, at Muncie, in a one storied building, a part of the business being to take heated iron from a furnace and manufacture it into, iron and steel by passing it through a system of rollers, situated on the floor of the building in a line extending north and south. The building was spanned by beams running east and west, about twenty-four feet from the floor. An iron track, extending north and south above said rollers, rested on said beams. There were suspended hooks upon pulleys running over said track between said beams, the hooks being used by operatives in passing iron in process of manufacture through the rollers, from one roller to another. The rollers were operated by steam by means of engines and boilers in charge of an engineer in the factory, which contained a furnace for heating the iron preparatory to rolling.

There were in the appellant's plant three mills, as they were called, a mill consisting of two or more furnaces, two or more sets of rolls, an engine, an arrangement called a telegraph, by which heated metal was carried from the furnace to the rolls, and the appurtenances connected to and with the telegraph, and hooks and tongs. The appellee, when injured, was working at a ten-inch mill. In operating this mill there were two sets of employes, called respectively, day turn and night turn. The turns consisted of a boss roller and certain assistants whose classes are named in the verdict, being seventeen men besides the boss roller. The person using the hook for putting the metal through the rolls was called a "hook-up." The appellee when injured was a hook-up on the night turn.

About the 21st of February, 1895, a piece of corrugated iron was placed by one Henry Wells across

two of said beams, which were ten to fifteen inches apart, and said iron extended northward from the north beam about four or five feet and over and in line with one or more of said rollers, its ends not attached or supported in any way.  Said Wells fastened said iron by nailing it to the south beam near the south end of the iron with two wire nails procured by him in said factory, for which purpose he could also have obtained additional nails.  The iron was so placed to prevent water from dropping upon the appellant's laborers and employes while engaged in operating the rolls beneath it.  It was not sufficiently and securely fastened, taking into consideration the circumstances and use to which it and the accompanying appliances were adapted and for which they were used.  The operation of the pulley and the jar of the mill caused the north end of the iron to vibrate continually, and the natural tendency of the vibration of the iron and the jar of the beams was to withdraw and loosen the iron from its fastenings.  In the operation of the pulley next to the beam upon which said iron was placed, it jarred the beam in running against it, and this constantly tended to loosen the fastenings of such iron and to cause it to fall off, as a necessary consequence, in the reasonable and ordinary operation of the pulley.

This corrugated iron had been in this position about four weeks, when, on the 25th of March, 1895, it left its fastenings, and fell down upon the appellee while at work at the rolls immediately under it.  The verdict described the appellee's injury and his medical treatment, and stated the value of the treatment.

The appellee first observed said iron in its place when he went to work at night, about three weeks before he was injured.  When he first discovered it, he was impressed that it might be dangerous and inse-

The Indiana Iron Company *v.* Cray, by Next Friend.

cure, and he or his colaborer, one McAlister, in his presence, at once called the attention of the engineer to its condition, and he or McAlister requested the engineer to go up and examine it.    The engineer declined to do so, but he at the time, promised to call the greaser to go up and examine it, and he did call the greaser, who went up and examined it.    He took hold of it and said it was safe, and thinking that it was securely fastened, he immediately came down and informed the engineer that it was perfectly safe, and the engineer immediately informed the appellee and McAlister that the iron was safe and secure; that it was as safe as if it had fifty nails driven in it.    The appellee thereupon believed that the iron was safe and securely fastened, and thereafter, until his injury, he continued to work at said place in the belief that the iron was safely and securely fastened, and had good reason so to believe, and did not have any reason to believe that it was unsafe or not securely fastened, and was not thereafter possessed of any facts or circumstances that would reasonably lead him to believe or know that the iron was not safely or securely fastened in its place.

It was found that there was nothing to obstruct the view of the iron below where it was placed; that it could be seen easily by the exercise of the ordinary sense of vision by any one looking to or examining the condition of the mill; that there was nothing to prevent the appellee from seeing it sooner than he did or to prevent the appellant or its agents charged with the duty of keeping the mill in repair from seeing the iron in its place.    It was also found, that there were a number of beams, bents, rafters, and other pieces of sheet iron in the immediate neighborhood of said corrugated iron; also the telegraph track; and that said piece of corrugated iron was hidden or

concealed, except one end, by the timbers and beams in and about the top of the building, and that a number of men who worked regularly about the ten-inch mill did not discover the iron, or know it had been put up until it fell.   Also, it was found, that the iron could be reached easily by a ladder upon a crane standing near it all the time; and to reach it one had to go by the ladder, and, when he reached the top of the ladder, to proceed upward and to one side from twelve to twenty feet on and over a beam about eight by ten inches.  It was found that there was an association, or labor union, known as the Amalgamated Association of Iron and Steel Workers; that prior to the appellee's injury the appellant entered into a contract or agreement with said association regulating the employment of roll hands in appellant's mill; that said association had certain rules and regulations regulating the employment of roll hands, one of which was, that all mills employing members of said union as rollers should employ the boss roller, and require him to hire or furnish his own assistants. . The verdict contained an interrogatory and answer as follows:  "(243) If you should find that The Amalgamated Association of Iron and Steel Workers had certain rules and regulations regulating the employment of roll hands, then state what those rules and regulations were. Answer.   We don't know."

The appellant employed one John L. Smith as the boss roller in its mill, and required him to furnish his assistants, and he and his assistants were to be paid a stipulated price per ton of the product passing through his hands, which amount of wages was to be distributed between said boss roller and his assistants in compensation for their services.   Said Smith, as boss roller, and his assistants, operated the set of rolls at which the appellee was injured.   At and be-

fore the time when the appellee was injured at said ten-inch mill, there had been and was a contract and arrangement by and between the appellant and said Smith, by which fagots of iron and steel were weighed and delivered by the appellant to said Smith at the furnaces of said ten-inch mill, and he received and accepted said fagots and metal from the appellant and put the same, at his own cost and expense, through said furnaces and said sets of rolls of said ten-inch mill, and produced merchantable iron and steel products; and said Smith was responsible for the material so delivered to him and for the production of merchantable iron and steel products from the same. Under and by virtue of this contract or arrangement the appellant furnished the motive power by and with which to run and operate the rolls of said ten-inch mill, and said Smith was paid by the ton by the appellants for such iron and steel products so by him manufactured. He was to be paid two dollars and thirty-five cents per ton for the good merchantable iron and steel products by him produced for the appellant under said contract and agreement.

The verdict contained the following: "(148) Did said John Smith have the sole control of the manner in which the fagots of metal furnished him should be manufactured into merchantable iron and steel up to the time the merchantable article was delivered to the defendant. The Indiana Iron Co.? Answer: Yes." "(149) After these fagots of metal were delivered to said Smith at said furnaces, did the defendant, The Indiana Iron Co., have or exercise any control of the manufacture of said metal until it was manufactured into merchantable iron and steel ready to be delivered to the shearer? Answer: Yes."

"(150) After the said fagots were delivered to said

Smith at the furnaces, if the defendant, The Indiana Iron Co., had any control or gave any directions concerning the way or manner in which said Smith should do and perform the work in making and manufacturing said metal into merchantable iron and steel bars, state what that contract was and what said directions were? Answer: To manufacture such iron and steel as said Indiana Iron Company directed."

Smith was boss roller in charge of the ten-inch mill and of the men running and operating it, when the appellee was injured. He was boss roller and in charge of the day turn that operated the ten-inch mill all the time he had operated it under said contract with the appellant. During all said time said Smith had a night boss roller, who had charge of said mill and the night turn. Said Smith had operated and run said ten-inch mill for more than three years under the contract and arrangement above mentioned. Said Smith hired all the men who constituted the sets of hands or employes called turns, who ran and operated said ten-inch mill, except the man in charge of the engine. Said Smith hired the assistant boss roller, the roughers, heaters, pull-ups, run-downs, stranders, straighteners, finishers, and hook-ups, and the appellant did not hire any of these men. Said Smith discharged these men at his pleasure. The appellant had authority to discharge these men, or any of them.

Smith kept the time of these men and each of them. He paid all of these men directly, except the roughers and heaters, who were paid by the appellant, and the amount paid them was deducted out of what was due Smith under his contract with the appellant. The roughers and heaters were paid by the appellant in accordance with a rule of the Amalgamated Associa-

tion of Iron and Steel Workers, adopted by that association for the protection of the roughers and heaters.   Said Smith fixed the amount of wages to be by him paid the men whom he employed to run and operate the ten-inch mill, and he hired the men who worked for him in running and operating said ten-inch mill, at such prices as he and they could and did agree upon; and at and before the time when the appellee was hurt, said Smith was paying the appellee such wages as he and said Smith had agreed upon, and the appellee, at the time he was hurt was being paid for his wages a certain sum for each ton of the iron manufactured by said ten-inch mill, and said Smith had fixed the amount per ton the appellee was to receive for his wages.   Said Wells and the appellee were both in the employ of said Smith, and were both hook-ups.   It was further found that the appellee had worked at the Indiana Iron Mill twice before the time at which he was working there when he was hurt. The first time he worked as a straightener, the second time as a hook-up.   He had been working there about eight or nine months immediately before he was hurt. He had then worked at this mill about twelve or fifteen months.   He had worked there as a hook-up about one year.   Each time the appellee worked at said mill he was hired by said Smith.   Each time, and during all the time, that the appellee worked at the said mill, his time was kept by said Smith, and Smith paid the appellee for all the work he did at said mill. During all the time appellee worked at said mill, and when he was injured, he was working for said Smith.

The verdict contains the following:  "(171) Did the plaintiff ever work for the defendant, The Indiana Iron Co.?  Answer: Yes."  "(172) Was the plaintiff working for or in the employ of the defendant when he was injured?  Answer: Yes."  It was further

found, that the appellee was in the employ of the appellant at the time he received his alleged injuries. When the appellee was injured the appellant had a day superintendent and a night superintendent, each competent, skilful, and reliable. One of these had a general oversight and management of the manufacturing establishment in which said ten-inch mill was situated during the day time, and the other at night. The appellant also had a master mechanic, whose duty it was to superintend, look after, and keep in repair the machinery in appellant's plant, and he was a competent and skilful man in his line of work. The appellant also had a boss carpenter, whose duty it was to keep the building and wooden structures in repair in and about said plant, and he was a competent and reliable mechanic. There was also an engineer in the employ of the appellant, whose duty it was to run and operate the engine which furnished power to drive the rolls in the ten-inch mill.

The verdict contains the following: "(188) Had this engineer any authority to make changes, alterations, or repairs upon or about the building in which the said ten-inch mill was situate? Answer: Yes." "(189) Had the engineer any power or authority to direct, require, or command any person who was employed in and about the defendant's said plant, to change, alter, or repair the structure or building in which said ten-inch mill was situate? Answer: Yes." It was found that by the contract and arrangement between said Smith and the appellant, the latter was to repair the sets of rolls in the ten-inch mill, when he gave notice of the necessity for repairs. He had not made repairs and improvements at his own expense on said ten-inch mill, and had not such right. An interrogatory and answer were as follows: "192. Under the contract and arrangement between

said Smith and the defendant, was said defendant to make any repairs on said ten-inch mill, except when notified or requested so to do by said Smith? Answer: Yes."

The appellant had never failed to repair the ten-inch mill or machinery connected with it when requested to do so by Smith. The piece of iron which fell was not any part of the machinery, but was a part of appellant's said building, which was complete before the piece of iron was put up. The building was a new one, having been built only three or four years, and was properly constructed for the uses and purposes for which it was built and used. The beams, etc., were made of sound and good materials. Smith was present when the corrugated iron was so placed by Wells, but Smith, or the general superintendent, the night superintendent, the master mechanic, or the boss carpenter did not, either of them, know that the piece of iron had been placed on the beams until after it had fallen. During the night run of the appellant's plant, the greaser acted for or in the place of the master mechanic. The greaser, in the discharge of his duties was subject to the orders and direction of the master mechanic, and was subject to the direction or authority of the engineer who operated the engine at the ten-inch mill during the night time. It was not any part of the duty of the engineer who run the engine at the ten-inch mill during the night time to inspect or repair any part of the machinery or buildings of said plant, except his engine.

It was found that the greaser was at the time employed by the appellant to oil certain parts of the machinery during the night run, and was under the control of the master mechanic, and was charged by the appellant with the duty of inspecting and repairing the same and appliances, or to report to the mas-

ter mechanic if he could not make the necessary repairs, and that it was his duty to inspect said piece of corrugated iron when called to do so. He received the direction and authority to inspect said iron from the engineer.

The verdict contained the following answers and interrogatories relating to damages:

"(94) What amount of damages has the plaintiff sustained as the direct and immediate result of said injury? Answer: Four hundred and eighty dollars."

"(97) If you find for the plaintiff, at what amount do you assess his damages? Answer: Twenty-seven hundred and fifty dollars, in full for damage including four hundred and eighty dollars on page 94."

It is correctly stated by counsel for the appellant that the complaint proceeds upon the theory that at the time of the appellee's injury the relation of master and servant existed between him and the appellant; that the latter was negligent and the former was not negligent, and that, but for the appellant's negligence, the injury would not have occurred; and it is insisted properly that it is an established rule that the plaintiff must recover, if at all, upon the case made by his complaint, and he cannot recover upon some other cause of action upon which he might have based his complaint. It is claimed that the theory of the complaint that the relation of master and servant existed between the parties to the action is not sustained by the verdict. The complaint proceeded upon the theory that the appellant had failed to perform a duty which it owed to the appellee, arising upon an alleged contractual relation of the parties. The existence of such relation was a material matter. A liability growing out of the violation of a duty not based upon such relation would be ground for a different cause of action; and a plaintiff must recover

according to his pleading as well as his proofs, or not at all. *Boardman* v. *Griffin*, 52 Ind. 101; *Chicago, etc., R. W. Co.* v. *Burger*, 124 Ind. 275; *New Albany Forge and Rolling Mill* v. *Cooper*, 131 Ind. 363; *Humpton* v. *Unterkircher*, 97 Ia. 509, 66 N. W. 776; *Reier* v. *Detroit Steel and Spring Works* (Mich.), 67 N. W. 120.

The appellant owned and operated the building, carrying on therein the business of manufacturing iron and steel, having therein certain employes who represented the appellant.   While it may be true that it owed to the appellee, as one rightfully upon the premises by license or invitation, the duty not to cause his injury through dangerous defects of the building or its attachments negligently suffered to exist, yet in such case the duty would not be one arising out of the contractual relation of master and servant, and a proper complaint to recover for such injury would not proceed upon the theory of the complaint of the case at bar.   It seems, therefore, proper, first to inquire whether or not the special verdict sufficiently sustains the theory of the complaint in this regard. An independent contractor is not, in any proper legal sense, a servant of his employer, but is one exercising an independent employment under a contract to do certain work by his own methods, without subjection to the control of his employer except as to the product or result of the work.   Various peculiarities of the employment have been regarded as important or controlling in particular cases.   It has been said that the test is, who has the general control of the work? Who has the right to direct what shall be done and how to do it?   See Wood on Master and Servant. section 314.   It was held in *Kelly* v. *Mayor, etc.*, 11 N. Y. 432, that when the person employing may pre-

scribe what shall be done, but not how it is to be done, or who is to do it, the person so employed is a contractor and not a servant.

It has been questioned whether there is any legal test by which in all cases it can be determined whether an employe is a servant. *Ewan* v. *Lippincott*, 47 N. J. L. 192. The mode of payment is a circumstance in solving the question whether the relation of master and servant exists, but it is not decisive. *New Orleans, etc., R. R. Co.* v. *Reese*, 61 Miss. 581; *Wright* v. *Terry*, 23 Fla. 160; *Miller* v. *Minnesota, etc., R. W. Co.*, 76 Ia. 655, 39 N. W. 188. The fact that the work is to be done under the direction and to the satisfaction of certain persons representing the employer, does not of itself render the person contracted with to do the work a servant. *Kelly* v. *Mayor, etc., supra; Brown* v. *Accrington Cotton, etc., Co.*, 3 Hurl & Colt. 511. In *Corbin* v. *American Mills*, 27 Conn. 274, it is held, that the manner of paying for the work or thing done, whether by the day or job, though a circumstance to be considered, is not a criterion for determining whether the employe is a contractor or a servant; and that the same is true of the existence of actual, present control and supervision on the part of the employer; and that the real test is, whether or not the person employed is acting for and in place of his employer and in his business in accordance with and representing the latter's will, and not his own. In Wood Master and Servant, section 317, it is said: "The real test by which to determine whether a person is acting as a servant of another is, to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control, and was liable to be discharged by him for disobedience of orders or misconduct."

The servant of one person may sometimes be re-

garded as fellow servant of the servants of another person. In *Ewan* v. *Lippincott, supra*, it was said, that one may be the servant of one master viewed in one aspect, and at the same time be considered as the servant of another person for the purpose of carrying out a legal policy. See McKinney, Fellow Serv. 41, note 1; *Illinois Cent. R. R. Co.* v. *Cox*, 21 Ill. 20, 71 Am. Dec. 298. In *Rummell* v. *Dilworth*, 111 Pa. St. 343, 2 Atl. 355, the plaintiff while at work in a spike mill was injured by being caught in the cogs of the rollers, which were not guarded by an adequate barrier. He was employed by the roller boss, and was paid by him. It was said by the court, that whether he was directly in the defendants' employ or indirectly as the assistant of the roller boss, he might be treated as the employe of the defendants. "He was engaged in the work of the defendants, upon their machinery, and the defendants were themselves operating the mill. The right of the roller boss to employ assistants is clearly shown, and as it does not appear that he was an independent contractor, it is unimportant that the amount of his compensation was measured by the number of tons manufactured." It was held that the defendants were bound as to the plaintiff to perform the duties arising out of the relation of master and servant.

The submission to the jury of two sets of interrogatories prepared by the contending attorneys, able and industrious, has resulted in a very long and complicated verdict, and it becomes our duty, so far as we can properly do so, to reconcile its findings with each other.

The factory with its machinery was not in the control of Smith, the boss roller, but it was owned and operated by the appellant. The appellant owned and furnished the building, machinery, material and mo-

tive power, and provided the superintendent, the night superintendent, the master mechanic, the boss carpenter, the engineer, and the greaser, and with all these things and persons and the boss roller and his assistants, including the appellee, it carried on the business of manufacturing iron and steel.

Smith was responsible for the particular material delivered to him by the appellant, and for the production from it of merchantable iron and steel. It was found that Smith had sole control of the manner of manufacturing the material so furnished into iron and steel, but it was also found that the appellant had or exercised some control of the manufacture, between the delivering of the material and the acceptance of the product; that the contract and directions were to manufacture as the company directed. The appellant was to repair the sets of rolls. Smith had not made repairs and improvements at his own expense, and had not such right.

Though it was found that the appellee was employed by Smith and worked for him, it was also found that he worked for the appellant, and that he was in the employ of the appellant when he was injured. The mode of employing and paying Smith and his assistants appears to have been influenced by an arrangement between the appellant and the labor union, regulating the employment of roll hands in the mill. The appellant employed Smith as boss roller. He was required to furnish his assistants. The material was delivered to him by the appellant, and he manufactured it at his own expense. He and his assistants were paid by the ton, the amount to be distributed between him and his assistants in compensation for services. Certain classes of the assistants received their wages from the appellant, the others from Smith. It would seem that there were in the

two turns for the three mills more than one hundred men who worked under the boss roller—the great body of the workmen in the factory operated by the appellant. If they were not servants of the company, it would not be responsible as their superior for their conduct toward third persons, while acting within the scope of their employment. The fact that Smith kept the time of his assistants, both those whom he paid and those whom the company paid, was not necessarily inconsistent with the existence of the relation of master and servant between Smith and the appellant.

The method of manufacture was by certain machinery which the boss roller had no right to repair or improve. The appellant owned and operated the factory, controlled the motive power, and furnished the only material that could be used by the boss roller. It controlled the time of manufacturing the product. The boss roller and his assistants were engaged in the employment in which also were the engineer and other employes. They were all engaged in the production of merchantable iron and steel for the appellant, all receiving their compensation from the same source. If work was not done in such manner as to satisfy the appellant, it could dismiss any workman. Because of this right of the appellant to discharge Smith's assistants, Smith had not unlimited power to determine who should assist him or how his assistants should work. The appellant was not restricted to the discharge of Smith for failure to discharge the appellee, but could itself discharge the appellee. It could dissolve a contract of hiring. This implies a contractual relation to which the appellant was one of the parties. In the case of the *New Albany Forge and Rolling Mill* v. *Cooper*, 131 Ind. 363, the defendant had not such right.

Smith seems to us to have held the position of a foreman, rather than that of an independent contractor. The determination of the matter as here presented is not free from difficulty. We do not base our decision upon particular incidents, but we have considered the whole case, and we have sought to reach a solution in harmony with the understanding of the parties, and consistent with a practical legal policy.

We need not extend this opinion with a discussion of the well established doctrine of the duty of the master to provide and maintain a reasonably safe place for his servant in which to perform his work in the course of his employment. This duty cannot be evaded by delegating to an officer or servant the preparation of the place or the making of repairs therein, or the inspection of the premises. The danger from the piece of corrugated iron could have been ascertained by proper inspection. The engineer had authority to make changes, alterations, or repairs upon or about the building, and authority to direct, require or command any person employed in and about the plant to change, alter, or repair the structure or building. It was the duty of the greaser to inspect the iron when called upon as he was by the engineer. When the appellee discovered the apparently dangerous iron he or his fellow workmen in his presence caused an inspection to be made by one whose duty it was to make it, and the appellee relied upon that inspection. The facts indicate that proper inspection would have resulted in a discovery of the danger. The appellant was responsible for the maintenance of the dangerous condition, at least after attention had been thus called to it.

The counsel for the appellant, in discussing the action of the court in overruling its motion for a new

trial, have pointed out statements of various witnesses, that the appellee was hired by the boss roller and was in his employ, and that he was not in the employ of the appellant; and counsel have thereupon insisted that the evidence does not support the averments of the complaint and show that the relation of master and servant existed between the appellant and the appellee.   We are unable to see in such testimony, any more than in the verdict, that the fact that the appellee was hired by the boss roller and was in his employ, as the jury understood their use of that word, prevented him from being the servant of the appellant and in its employ as the jury also found.

A motion made by the appellant to modify the judgment was overruled.   The motion was based upon the answers of the jury to the two interrogatories relating to the amount of damages quoted above.   To one interrogatory inquiring as to the amount of damages sustained by the appellee "as the direct and immediate result" of the injury, the jury answered $480.00.   In answer to the other interrogatory the jury assessed the amount of the appellee's damages at $2,750.00, including said $480.00.

Indulging the reasonable presumption that the jury understood the language of the interrogatories in their popular or ordinary meaning, rather than in any technical legal sense, and considering the jury's answer to the question concerning damages sustained as the direct and immediate result as having relation to consequences which followed immediately in point of time, and regarding the answer to the other interrogatory as including also damages which arose from more remote and indirect consequences by way of the permanent injury to health found by the jury, we are unable to find error in this action of the court. The judgment is affirmed.