[No. 7814.    Decided March 16, 1909.]

JOHN P. NELSON, *Appellant*, v. WESTERN STEAM
NAVIGATION COMPANY, *Respondent*, PACIFIC
COAST STEAMSHIP COMPANY, *Appellant*.[1]

MASTER AND SERVANT—RELATION—SHIPPING—PROOF OF OWNERSHIP
OF VESSEL—EVIDENCE—SUFFICIENCY. In an action for personal in-
juries sustained by a sailor, there is not sufficient evidence that de-
fendant, a corporation whose officers were nonresidents, was the
owner of the steamship or had any control over it, and a nonsuit
is properly granted, where the evidence merely showed that de-
fendant's name was painted across the bow, its stationery, tickets,
and shipping receipts used, the ship was running under a bond there-
tofore given in defendant's name, and one of its stockholders had
signed the name of agents to a contract agreeing to run the ship
in defendant's name, such contract clearly showing that defendant
had no control of the ship or share in its profits, and there was no
evidence tending to. show actual or constructive notice by the de-
fendant of any of the above facts, and it appeared that the defendant
had previously sold its line of steamers and was not operating any.

CORPORATIONS — REPRESENTATION — STOCKHOLDERS. The fact that
one of the stockholders of a corporation entered into a contract with
reference to the use of the corporate name by a third person, is not
constructive notice to the corporation of the terms of the contract.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for
$2,000 for personal injuries sustained by a sailor and longshoreman,
thirty-two years old, earning $40 per month as a sailor, and capable
of earning 40 or 50 cents per hour as longshoreman, is not excessive,
where it appears that his toes were crushed and had to be ampu-
tated, that he suffered great pain, was in the hospital 2½ months
and lost about six months' time, and cannot follow the occupation
of sailor or longshoreman.

APPEAL—PRESERVATION OF GROUNDS—EXCEPTIONS—RULINGS ON EVI-
DENCE. Under Bal. Code, § 5054, an exception is not necessary where
an objection is interposed and a ruling made on the offer of evi-
dence.

SAME—EXCEPTIONS TO INSTRUCTIONS—NECESSITY. An exception to
instructions to the jury on a certain subject is not necessary to
predicate error on the exclusion of evidence thereon, after objection
interposed and ruling made at the trial.

[1]Reported in 100 Pac. 325.

DAMAGES—PERSONAL INJURIES—MEDICAL ATTENDANCE—WHEN RE-COVERABLE—FREE HOSPITAL. In an action for personal injuries, the plaintiff cannot recover the reasonable value of medical attendance and hospital charges furnished to him as a sailor free of charge at a marine hospital.

MASTER AND SERVANT—RELATION—EVIDENCE—OWNERSHIP OF VES-SEL. In an action by a sailor to recover damages for personal in-juries from the owner of the ship, evidence is admissible as to re-pairs and damages paid by defendant, resulting from a collision with another vessel, as tending to show the defendant's ownership and operation.

CONTRACTS—CONSTRUCTION   BY   PARTIES—AMBIGUITY—EVIDENCE. Where a contract is ambiguous, evidence is admissible to show the construction placed on it by the parties.

MASTER AND SERVANT—RELATION—LIABILITY OF OWNERS OF VES-SEL—CHARTER—EFFECT—CONSTRUCTION. There is no such complete demise or charter of a steamship as will make the charterers owners pro hac vice and release the general owners from liability for in-juries to a sailor caused by reason of the negligence of the mate, where the agreement for the operation of the ship by the charterers provided for a division of the earnings, and as construed by the parties, the general owners had "more or less control of the ship," employed the captain and chief engineer (the captain employing the mate) and paid for repairs, expenses, and damages arising in the operation; since the fact that the charterers could not discharge the captain without the consent of the general owners, establishes the relation of master and servant between the owners and captain.

MASTER AND SERVANT—INJURIES TO SEAMAN—NEGLIGENCE OF MAS-TER—VICE PRINCIPALS—EVIDENCE—SUFFICIENCY. There is sufficient evidence of negligence to render the owner of a steamship liable to a sailor who was injured while assisting to load a boiler plate, where it appears that the mate, who was drunk, ordered him to pry on the plate with a crowbar, and then without warning, and while his back was turned, started the steam winch with a jerk, causing the fall rope to break and the plate to fall and injure the plaintiff; as the mate is a vice principal and not a fellow servant of the seaman.

MASTER AND SERVANT—RELATION—EVIDENCE. A contract purport-ing to be signed by the defendant, under which the ship was operated by defendant and it received its share of the profits, is admissible in evidence to show ownership, without proof of its execution.

APPEAL—REVIEW—HARMLESS ERROR. The admission in evidence of a contract, without proof of its execution, to show the relation of master and servant is harmless where the relation was established by other evidence.

Cross-appeals from a judgment of the superior court for King county, Tallman, J., entered July 9, 1908, upon the verdict of a jury rendered in favor of the plaintiff against one of the defendants, after the granting of a nonsuit in favor of the other defendant, in an action to recover for personal injuries. Affirmed on plaintiff's appeal, and reversed and the amount of the recovery reduced on defendant's appeal.

*Wilson R. Gay* and *Geo. H. Rummens*, for appellant Nelson.

*Farrell, Kane & Stratton* and *Peter L. Pratt*, for appellant Pacific Coast Steamship Company.

*Hughes, McMicken, Dovell & Ramsey*, for respondent Western Steam Navigation Company.

Gose, J.—On October 9, 1906, the appellant Nelson was injured while working as a sailor in loading a steel boiler plate on the steamship Ramona, at the pier in the city of Seattle. The complaint alleges, that the appellant Nelson, on October 9, 1906, was employed as a seaman on the steamship Ramona, by the respondent and the appellant corporations; that on said day he was working under the direction of the mate of the ship; that the mate was undertaking to load a large piece of boiler plate, by means of a spar derrick operated by a steam winch and a defective fall rope; that the fall rope was attached to the plate by means of grab hooks; that, in the process of loading, the steel plate caught under a stringer or riser at the outer edge of the pier; that the mate ordered him to assist in prying the plate free with a crowbar; that while he was engaged in doing this, the mate suddenly and without warning or notice started the winch, by reason of which the fall rope broke, the plate fell against the crowbar and knocked it from his hands, causing it to strike the three inside toes, so injuring them that it became necessary to amputate them; that they

were amputated, and that his damage was $12,000. The respondent company put all these averments in issue by proper denials.

The appellant corporation, after making suitable denials, pleaded affirmatively, (1) that the injury, if any, was due to the negligence of the appellant Nelson; (2) that it was due to the negligence of a fellow servant; (3) that it was due to risks assumed by Nelson. At the conclusion of the evidence, its sufficiency was challenged both by the respondent and by the appellant corporation. The challenge was sustained as to the respondent, and denied as to the appellant corporation. Whereupon the jury, returned a verdict of $2,000 against the appellant corporation, and a judgment was thereupon entered against it for that amount, and dismissing the case as to the respondent. The appellant Nelson has appealed from that part of the judgment in favor of the respondent, and the appellant corporation has appealed both from the judgment against it and from that part of the judgment in favor of the respondent.

We will first consider whether any error was committed in entering a judgment in favor of the respondent. The evidence upon which a recovery was sought against it was, that the name of the respondent appeared in large letters across the bow of the steamer, under the name "Ramona;" that the stationery, tickets, shipping receipts, and bills of lading were those of the respondent; that the ship was running under a bond theretofore given to the government in the name of the respondent; that one of its stockholders signed the name of Cook & Company to a contract which they entered into with the appellant corporation, whereby it was agreed that the Ramona should be run in the name of the respondent. It is also claimed that the ship was flying the respondent's flag, but the evidence shows that it was flying the flag "V. L.," meaning "Victoria Line," and that it was the flag of the appellant corporation. It does not appear that the respondent authorized the use of its name

on the boat, or that it had any knowledge of the contract between Cook & Company and the appellant corporation. Nor does it appear that the respondent had any notice that its stationery was being used. Exhibit A, the contract between Cook & Company and the appellant corporation, is the only written evidence in the record as to the names of the operators of the ship or the division of the profits resulting from its operation  It shows clearly that the respondent had no share in its profits, and that it had no part in its management or control. The evidence makes it clear that, in 1903, the respondent sold its line of steamers and good will to the appellant corporation; that since that time it has not operated any ship on the Sound; that its officers were nonresidents of the state at the time of the accident.

The record is barren of evidence tending to show that the respondent had either actual or constructive notice that the ship was to be operated in its name, or that it was so operated, aside from the fact that one of its stockholders signed the name of Cook & Company to the contract to which reference has been made. This is not constructive notice. The appellant corporation owned the ship, and prior to the execution of the contract with Cook & Company, it had been running it. There is no evidence as to who placed the name of the respondent on the boat, other than the presumption which may be drawn from the admitted ownership. It does not appear that any conduct upon the part of the respondent induced the belief in any one that it was in any way connected with the operation of the steamer. Every act tending to connect the respondent with its operation was the act either of Cook & Company or the appellant corporation, or both, and did not proceed from any authority derived from the respondent, either express or implied.

To hold the respondent liable in damages under the evidence in the record would be to extend the doctrine of estoppel beyond both principle and reason. *Ames v. Farmers & Mechanics Bank,* 48 Wash. 328, 93 Pac. 530, is cited in

support of the respondent's liability.    It is clearly distinguishable.    In that case a depositor in the Bank of Cheney sued the Spokane bank for the recovery of the amount of his deposit, and alleged that the Cheney bank had advertised itself as a branch of the Spokane bank; that the latter had notice of such advertisement; that the two banks had united as principals in a bond which recited that the Cheney bank was controlled by the Spokane bank; that the Spokane bank through its vice president and cashier, in the application for such bond, made a like statement; that the president of the Spokane bank had knowledge of these facts.    We conclude, therefore, that the court did not err in sustaining the respondent's challenge to the evidence and entering a judgment of dismissal in its favor.

The appellant corporation assigns eight errors as to the judgment entered against it, which it groups in its brief under two heads, viz: (1) Granting a cause of action, what is the proper measure of damages? (2) Was there a cause of action established against it?    We will consider these points in the order stated.

The evidence shows that the appellant Nelson was thirty-two years of age, a sailor and longshoreman by occupation; that at the time of the accident he was earning $40 per month, and board and lodging; that as a longshoreman he could earn forty or fifty cents an hour; that the great toe and the two adjoining ones were badly mashed; that he was taken to the hospital shortly after the injury occurred, and two of his toes were amputated that evening; that such amputation was necessary; that three weeks later the foot became so discolored and swollen that the great toe was amputated; that he suffered great pain; that he was in the hospital from October 9 until December 21 following; that he could not sooner leave the hospital; and that he was not able to work until the following April.    At the time of the trial, May, 1908, he testified that his foot would get sore and tender and pain him in walking.    The evidence further

shows that he cannot follow the occupation either of a sailor or of a longshoreman.   The jury saw him and heard him testify.   It is clear that the verdict was not excessive except as to the items hereafter stated.

A witness for the appellant Nelson, Dr. Underwood, in his direct examination testified that $75 was the reasonable value of the services of the surgeon for performing the operation; that the value of the ward at the hospital was $8.50 a week, and that the value of the operating room was $10.   On his cross-examination the following transpired:

"Question:   Did you attend him immediately after he received his injury?   Answer:   Yes, sir.   Q.   He was sent to the marine hospital at Port Angeles, was he?   A.   Here in this city.   Q.   And you are one of the physicians there? A.   Yes, sir.   Q.   Mr. Nelson was a sailor, wasn't he?   A. He was.   Q.   And they don't have to pay?"

Here an objection was interposed and sustained by the court; whereupon the following occurred:

"Q.   You are employed by the government and paid by the government, aren't you, doctor?   A.   Yes, sir.   Q. And the marine hospital, do they take any one except sailors and seafaring men?   A.   They don't; no, sir."

The ruling of the court sustaining the objection to the question, "And they don't have to pay," is urged as error. The court instructed the jury that, "You should take into consideration the reasonable value of the services of medical attendance, hospital bills, in nursing and caring for his injury not to exceed $250."   No exception was taken to the ruling of the court, and the appellant Nelson contends, therefore, that no error can be predicated on that ruling. When an objection is interposed and a ruling made thereon, an exception is not required.   Bal. Code, § 5054 (P. C. § 671).   Nor was the appellant corporation required to except to the instruction to preserve the question.   The attention of the court had been directed to the fact that it sought to show that the appellant had not incurred any expense for surgical aid or hospital bills.   The court refused to permit

it to make such showing. It therefore has a right to urge this error. *La Rault v. Palmer*, 51 Wash. 664, 99 Pac. 1036. The fundamental conception of damages is that it means compensation. This court has held that, where such expenses have been incurred, they can be recovered even before payment. *Cole v. Seattle, Renton & Southern R. Co.*, 42 Wash. 462, 85 Pac. 3. It has not held that there can be a recovery for a service of value where no charge has been made therefor. Such items have no support either in right or in law, and the ruling of the court was erroneous. *Lawson v. Seattle & Renton R. Co.*, 34 Wash. 500, 76 Pac. 71. The testimony admitted shows that the value of such items does not exceed $175. The testimony as to the repairs to the ship and the payment of damages by the appellant corporation, resulting from a collision between the Ramona and another ship, tended to show that the appellant corporation owned and was exercising control over the ship, and its admission was not error.

(2) Was there a cause of action established against the appellant corporation? The following memorandum of contract was admitted in evidence and is the Exhibit A to which reference has been made:

"Memorandum of agreement between C. W. Cook & Co., and Pacific Coast Steamship Co., in reference to the operation of the Str. Ramona on the Seattle-Tacoma-Vancouver route.

"The Str. Ramona will be operated by Cook & Co., under the name of the Western Steam Navigation Co., from the present date up to the time Cook & Co. have a vessel to place upon the run, the Pacific Coast Steamship Company allowing Cook & Co. five (5%) per cent of the gross earnings as compensation for the operation and management of the said Steamer Ramona up to the time Cook & Co. have a steamer to place upon the run.

"On and after the date Messrs. Cook & Co. have a steamer ready to place upon the run the operations shall be as follows:

"It shall be mutually agreed as to which steamer shall be

operated, as far as possible the Ramona to be operated in the summer time, the steamer owned by Cook & Co. to be operated in the winter time, or say between November 1st and May 1st, the earnings of the steamer that is upon the run to be divided on the basis of seventy-five (75%) per cent of the net earnings to the owner of the steamer and twenty-five (25%) per cent to the other party. For instance, if the Str. Ramona is operating thereon, the Pacific Coast Steamship Co. are to receive seventy-five (75%) of the net earnings, Cook & Co. twenty-five (25%) per cent of the net earnings. If the steamer which Cook & Co. will have to place upon the run is operating thereon, the net earnings to be divided seventy-five (75%) per cent to Cook & Co. twenty-five (25%) per cent to the Pacific Coast Steamship Co.

"This arrangement to continue in effect until January 1, 1909. Should cancellation be desired by either party, six months' written notice should be given. This, however, will not prevent either party from withdrawing the boat owned by such party from the run if found desirable.

"This agreement dated Seattle, Washington, this fourth day of August, 1905.        C. W. Cook & Company,
                                   "By C. W. Cook.
                         "Pacific Coast Steamship Company,
                                   "By W. E. Pearce."

The contract being ambiguous in certain particulars, evidence was properly admitted showing the construction placed upon it by the parties. The testimony of the manager for Cook & Company, shows that the captain and chief engineer were employed by the appellant corporation; that the captain employed the mate; that the mate employed the sailors; that the appellant corporation "had more or less control of the ship;" that Cook & Company "would have to consult them before we could do anything;" that Cook & Company could not discharge the captain and put their own man in authority without the consent of the appellant corporation; that if the expenses exceeded the receipts, the appellant corporation paid the deficit; that the appellant corporation paid for putting sheathing on the ship; that when the Ra-

mona collided with the Moana, the appellant corporation paid the damages; that the respondent sold its line of steamers, good will, and assets to the appellant corporation in 1903. The only deduction which can be drawn from this undisputed evidence is, that the appellant corporation through the captain retained the control of the ship; that the captain was its servant; that he employed the mate, and the latter hired and discharged the sailors. The negligence of the mate was the negligence of the master.

Under this head the appellant corporation argues that there was a complete demise or charter of the ship to Cook & Company, and that as charterers they became the owners *pro hac vice*, and that no liability rests upon it. The authorities which it relies upon to sustain this contention proceed from the premise that there must be a full and complete divestiture of all management and control upon the part of the owner in order that he may escape liability. In *Thorp v. Hammond*, 12 Wall. 408, 20 L. Ed. 419, it is stated that the evidence shows that the ship was "commanded, sold, and exclusively managed" by the charterers. The court was equally divided as to the liability of the general owners. *Posey v. Scoville*, 10 Fed. 140, states that the general owner of the steamer appointed the officers with the evident consent of the charterers. In *Webster v. Disharoon*, 64 Fed. 143, 144, it is said:

"It is clear that the master of the Margie J. Franklin must be regarded as her owner *pro hac vice*. He sailed her on shares, and had sole control of her use and navigation."

In *The Shadwan*, 49 Fed. 379, 381, it is said:

"The charter, moreover, provided expressly 'that the captain, although appointed by the owners, shall be under the orders and directions of the charterer, as regards employment, *agency*, or other arrangements.' "

The foregoing are the strongest cases tending to support the contention of the appellant corporation to which our attention has been directed. The facts in this case are clearly

distinguishable from those upon which such opinions were based. We think the true rule, and the one which should control in this case, is stated in *Scarff v. Metcalf*, 107 N. Y. 211, 13 N. E. 796, 1 Am. St. 807, wherein, at page 810, the court said:

"There is very much of authority for the doctrine that where there is a charter of the vessel which strips the owner of all authority, possession, and control, the charterer becomes owner *pro hac vice*, and the general owner ceases to be liable for the contracts or torts of the master, except for the wages of seamen. There seem to be limitations upon that doctrine, and doubts about it, although the main drift of authority is in that direction: *Hallet v. Columbian Ins. Co.*, 8 Johns. 272; *Thorp v. Hammond*, 12 Wall. 408; *Thomas v. Osborn*, 19 How. 22; *Reynolds v. Toppan*, 15 Mass. 370, 8 Am. Dec. 110. But I have arrived at the conclusion that this doctrine, even if broadly maintained, applies only to cases in which there has been an actual demise of the vessel such as to take from the owner all possession, authority, and control, and not to cases where there has been merely a contract about the vessel for the division of earnings and expenses. There are cases which may justly be cited as not in accord with that conclusion: *Taggard v. Loring*, 16 Mass. 336, 8 Am. Dec. 140; *Cutler v. Winsor*, 6 Pick. 335, 17 Am. Dec. 385; but the current of authority in this state runs in its favor, and I am strongly convinced that it is sound in principle and just in its application. In *Hallet v. Columbian Ins. Co.*, *supra*, there was an actual charter of the vessel, the owners receiving a stipulated price for its use. In *Thorp v. Hammond*, *supra*, the arrangement, although a letting on shares, is described by the court as, in effect, a chartering of the vessel, and a surrender by the owner of all authority and control. The case was one of collision, and largely affected by the terms and language of the act of Congress of 1851. In *Kenzel v. Kirk*, 37 Barb. 113, where the vessel was let to the master on shares, he to provide supplies, it was ruled that there was not a 'positive chartering,' and the owners were liable for supplies to a vendor ignorant of the arrangement. In *Macy v. Wheeler*, 30 N. Y. 241, it was said that the liability for supplies depends, not on legal ownership, but possession and control.

In *Vose v. Cockroft*, 45 Barb. 58, 60, there was a written agreement that the master should sail the vessel on shares in the customary way, he to man and provision her, pay one-half of port charges and expenses and of extra labor, and have 'as wages' one-half of the gross freight. This was held not to be a chartering of the vessel, and great force was given to the stipulation describing the master's share as 'wages.' In *McCready v. Thorne*, 49 Id. 438, there was a letting on shares, the master to victual, man, and sail the ship at his own expense, pay port charges out of earnings, and divide the balance equally with the owners. It was ruled that the master was not owner *pro hac vice*, and that the general owners were liable for unpaid port charges. A comparatively recent case in the English courts discusses the liability of the owner for the negligence of the master, where the relations between them were much like those in the case at bar: *Steel v. Lester & Lilee*, L. R. 3 C. P. D. 121. Lester was owner, and Lilee was captain. It was agreed between them that Lilee should sail the ship wherever he chose, be at liberty to take or refuse any cargo, engage and pay the men, and furnish all requisite supplies, and give Lester one-third of the net profits. While the vessel was unloading at its port of destination, under a charter-party made by the master, the wharf was damaged by the sloop through the negligence of Lilee, and Lester was sued for the damages. The court decided that the arrangement did not amount to a demise of the vessel, and was not such an absolute parting with it as would sever the control. These authorities indicate a distinction, which I am content to recognize, between an actual demise of the vessel, which transfers its possession, and all authority and control over it, and a mere arrangement for the sailing of the ship, which does not amount to a demise, and therefore leaves some possession, authority, and control in the owner, although narrowed and restricted by the terms of the agreement. Unless there is an actual demise of the vessel which destroys the relation of master and owner, and substitutes that of bailor and bailee, the relation must continue, and the master remain servant and agent of the owner."

See, also, *Indiana Iron Co. v. Cray*, 19 Ind. App. 565, 48 N. E. 803. Cook & Company could not discharge the captain without the consent of the appellant company, which

means that they could not discharge him at all. This fact establishes the relation of master and servant between the appellant corporation and the captain. *Butler v. Townsend,* 126 N. Y. 105, 26 N. E. 1017. In *Pioneer Fireproof Const. Co. v. Hansen,* 176 Ill. 100, 108, 52 N. E. 17, the rule as to what constitutes control of a servant is aptly stated in the following language:

"Control of servants does not exist, unless the hirer has the right to discharge them and employ others in their places."

Upon the question of negligence there was testimony showing, that at the time of the accident the mate was running the steam winch; that he knew the boiler plate was caught under the riser at the outer edge of the pier; that he directed Nelson to pry on it with a crowbar; that the mate saw, or by the exercise of reasonable care could have seen, Nelson; that while Nelson was prying on the plate with the crowbar, with his back to the ship, one end of the plate being then elevated above the pier, the mate, who was then drunk, without any warning or notice, started the steam winch with a jerk, when the fall rope, attached both to the winch and the boiler plate, parted; that the boiler plate fell against the crowbar which Nelson was using, causing it to be thrown across his foot, inflicting the injury hereinbefore stated. This evidence is amply sufficient to establish negligence. The mate was a vice principal. *Tills v. Great Northern R. Co.,* 50 Wash. 536, 97 Pac. 737. The admission of Exhibit A in evidence is urged as error, for the reason that its execution by the appellant company is not proven. It purports to have been signed by the appellant company, and the undisputed evidence shows that the ship was operated under it, as construed by the parties to the contract; that the appellant corporation received its share of the profits resulting from the operation of the ship. Moreover, without it there was abundant evidence to establish the relation of master and servant

between the appellant corporation and the ship captain. We conclude, therefore, that this contention is without merit.

In view of the error in rejecting testimony tending to show that the appellant Nelson incurred no liability for surgical or hospital fees, the cause will be reversed, and if the appellant Nelson elects to accept $1,825, and costs in the court below, within ten days after the remittitur is filed there, a new judgment will be entered for that amount against the appellant corporation. Otherwise a new trial is granted. Neither appellant will recover costs in this court. The case will be affirmed as to the respondent, and it will recover its costs from the appellants.

FULLERTON, CHADWICK, DUNBAR, MOUNT, and CROW, JJ., concur.