[No. 9281.    Department Two.    March 22, 1911.]

WILLIAM G. MALLOY *et al.*, *Appellants*, v. INTERSTATE IRRIGATION COMPANY, *Respondent.*[1]

BROKERS—COMMISSIONS—CONTRACTS—CONSTRUCTION. A broker's commissions are payable out of the proceeds of the sale, and not unconditionally at the time deferred payments of the purchase price are made, where the contract provided that one-half of the total commissions shall be deducted from the first payment, the balance to run according to the terms of the sale contracts, that is, divided into as many payments as the contracts call for; especially where the parties at first so construed it and acted accordingly for some time.

SAME. In such a case, proportionate commissions are properly allowed upon partial payments received in compromise of cancelled contracts.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered December 18, 1909, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action on contract. Affirmed.

[1]Reported in 114 Pac. 167.

*Post, Avery & Higgins,* for appellants.

*H. M. Stephens,* for respondent.

PER CURIAM.—In August, 1906, the respondent acquired
title to a large tract of land in Kootenai county, Idaho, which
it proposed to plat and sell in small tracts. Appellants
Malloy became the exclusive agents for one year, under a
contract the material parts of which follow:

"(2)   Said second parties are to sell the lands at a price
not to exceed $150 per acre and at whatever price under that
amount which they may see fit, provided, the company re-
ceives on each and every acre a net price of not less than
$100 per acre where sales are made at $125, and a net price
of $125 where sales are made at $150.   In other words, said
first party authorizes the second parties to sell this land at
a divided price of $125, and $150 per acre and of any tracts
which are sold at $125 per acre or less, said first party shall
receive a net price of $100 per acre.   In the event of the
second parties selling the lands at a price to exceed $125 per
acre, said first party shall receive a net price of $125 per
acre.   First party reserves the privilege, and it is optional
with them at any time, to advance the net price of any of
their lands, and the said second parties must govern the sale
price according to advances which might be made by first
party.   It is understood and agreed by both parties that
second parties shall not hold the lands at a net price which
would allow them more than $25 per acre as a commission.

"(3)   It is understood by both parties that second parties
may sell the lands upon a cash payment of one-fourth of the
total purchase price and the deferred payments to be divided
into three equal annual payments with interest at 7% per
annum.   These terms of sale, however, can be changed at the
option of the first party upon a written notice to second
parties of at least two weeks in advance of the date at which
they desire to make different prices or terms.

"(4)   It is also understood and agreed that first party
shall use contracts covering whatever sales might be made by
second parties; and in said contracts the total purchase
price of the land described in contract shall be shown and
from whatever amount constitutes first payment on said con-
tract or contracts, one-half of the total commissions made on

the sale by second parties will be deducted and held by second parties and the balance of the commissions due on said sales shall run according to the terms of the contract, that is, if the contract calls for three annual payments, the deferred commissions due second parties shall be divided into as many payments as the contracts call for, and the first party shall, whenever desired by second parties, give in writing to said second parties an acknowledgment of whatever commissions are due on deferred payments called for in contracts issued by said first party."

The land contract agreed upon by the parties was, with such modifications as the character of the transaction demanded, the usual executory contract of sale or option agreement. The parties operated under this contract until about November, 1907, when the books of the agents having been experted, the relations of the parties were terminated, the Malloys executing a note for $12,500 to cover payments made to them on account of land contracts. This note was thereafter assigned to the Exchange National Bank. The note carried, as collateral to the principal engagement, accruing commissions due the Malloys on the contracts of sale which were issued by them. One-half of the commission was retained by the agents out of the first payments on the contract. After the lapse of sufficient time to mature other payments, some of the contracts were cancelled, partial payments were accepted on others, and on some, differences arising between respondent and its vendees were arbitrated, so that the purchasers were deeded an amount of land equal in value to the first payment. The Malloys were also owing to respondent a sum not included in the note above mentioned, and after the business had been taken over by respondent, it applied on this account an amount equal to their commission on each deferred payment as it was received, until the account was satisfied; and thereafter, and in the same manner, such sums were paid to the bank for credit on the note. When a partial payment was made, no credit was carried to the account or note until the full amount of the payment came in. No credits for

commission were allowed on cancelled or on compromised contracts. This method of the respondent was pursued without challenge until June 2, 1908, when the Malloys by letter informed respondent that, under their construction of the contract, they were entitled to the full amount of their commission or an amount equal to their commissions at the due dates, their position being most tersely stated by their counsel as follows:

"In other words, that the question of defendant's receiving such payment is immaterial in determining when the commission shall be paid to the plaintiffs, but that the commission on each sale is due at the time when the payments on account thereof are due as in the original contracts written, and nothing done thereafter by the defendant, or the purchaser, can in any way affect the due date of the commissions, or the amount thereof."

Aside from the conduct of the parties, to which it is always proper to refer when construing doubtful or ambiguous contracts (*Nelson v. Western Steam Nav. Co.*, 52 Wash. 177, 100 Pac. 325), we can agree with the lower court that the contract itself makes it plain that it was the intent of the parties that the commissions were to be paid out of the moneys paid in by the vendees, and was not an engagement to pay in any event. The agency contract, as well as the contracts of sale, they being merely executory in their character and providing for cancellation, would indicate that it was within the contemplation of the parties that the vendees might default leaving the property on the hands of the respondent. This conclusion relieves respondent of the burden of bearing the rule invoked by appellants that their contract was performed when they produced a purchaser who was ready, able, and willing to buy on the terms prescribed by the vendor. The rule undoubtedly is that, where a satisfactory contract is made through the effort of a broker, his right to a commission cannot be denied or affected in any way by any modification of the contract between the

seller and the buyer, in the absence of any provision in the contract to the contrary. But it is equally well settled that, where the parties have contracted the manner and time of payment of a commission on a real estate contract, the contract will control without resorting to the general rule.

Some weight is attached by appellants to those words in the contract "deferred commissions due," etc., it being insisted that these words indicate that the balance of the commission, after deducting the first half from the down payment, became payable when the deferred payment became due. But we cannot take a few words or even a single clause of the contract, but are bound to look to the whole of it. If the words be given the full weight contended for by appellants, we are met by another clause which seems to provide that it was the first intent of the parties that respondent should receive a net price for the land. When considered together, these provisions make the construction placed upon the contract by appellants arbitrary and unreasonable.

At the close of the plaintiffs' case a motion was made for judgment. The trial court held that the contract was plain and needed no construction, but suggested that there would be a proportionate amount of commissions due upon partial payments and sums received in compromise of cancelled or arbitrated contracts, and suggested that the question might be left to a bookkeeper. The motion for judgment was withdrawn, the attorney for respondent indicating his purpose to supply evidence which would make the items clear. Considerable evidence was taken to show the transaction and conduct of the parties, but we find nothing in the statement of facts to verify the amount found by the court, which was $333.70. Assuming, however, that this finding was made after reference to the books and accounts of the company, the judgment is affirmed.