[No. 45070. En Banc. November 2, 1978.]

HELEN B. CIMINSKI, *Respondent,* v. SCI CORPORATION, *Appellant.*

*James R. Hermsen* and *Frederick M. Meyers* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S.*), for appellant.

*Sterbick, Lumsden & Sterbick,* by *Michael J. Sterbick* and *Gregory C. Abel,* for respondent.

*Steven F. Fitzer* on behalf of Washington Association of Defense Counsel and *Daniel F. Sullivan* and *Donovan R. Flora* on behalf of Washington State Trial Lawyers Association, amici curiae.

HICKS, J.—The question of whether Part A Medicare payments made to an eligible recipient are payments from a collateral source is one of first impression in this state. Consequently, we are free to adopt that solution which appears most sensible and equitable, and we hold that such payments are from a collateral source.

Respondent, a 73–year–old widow, fell in appellant's restaurant and sustained severe hip injuries. The facts are set forth with some particularity in *Ciminski v. Finn Corp.*, 13 Wn. App. 815, 537 P.2d 850 (1975). As the widow of a "qualified railroad retirement beneficiar[y]" (42 U.S.C. §§ 1395c, 1395i–1(1)), she was eligible for Medicare payments. Her medical expenses paid under Part A Medicare amounted to $14,000.

In an action for her injuries brought by respondent against appellant, the jury returned a verdict for $79,000. Appellant moved in the trial court to reduce the award by the amount of the Part A Medicare benefits. The trial court denied the motion on the ground that the payments were from a collateral source. Direct appeal was retained by this court.

Part A Medicare, 42 U.S.C. § 1395c *et seq.*, sometimes known as the hospital coverage, and Part B Medicare, 42 U.S.C. § 1395j *et seq.*, referred to as the physician coverage, derive from two separate programs. *See Witherspoon v. St. Paul Fire & Marine Ins. Co.*, 86 Wn.2d 641, 548 P.2d 302 (1976). Part A is financed by specific taxes on employees' wages, employers' payrolls and income of the self-employed. 42 U.S.C. § 1395i. Part B is a voluntary program financed by the monthly premiums of participants and supplemented by general appropriations. 42 U.S.C. §§ 1395r, s, t and w.

The Medicare program, 42 U.S.C. § 1395 *et seq.,* which included the financing thereof, was enacted by Congress in 1965. Respondent's husband retired under the Railroad Retirement Act of 1937, 45 U.S.C. § 228a *et seq.,* and died in May 1957. Since respondent was never employed after her husband's death, neither she nor her husband had wages upon which taxes financing Part A Medicare were paid.

Under the collateral source rule, payments, the origin of which is independent of the tort–feasor, received by a plaintiff because of injuries will not be considered to reduce the damages otherwise recoverable. *Stone v. Seattle,* 64 Wn.2d 166, 391 P.2d 179 (1964). Respondent perceives Part A Medicare payments as from an independent and collateral source; appellant does not.

Appellant and amicus, Washington Association of Defense Counsel, argue that the collateral source rule applies only to those benefits, such as payments from accident or health insurance, for which the plaintiff has previously extended consideration. Here, it is contended, neither respondent nor her husband had wages which were taxed to finance Medicare and, therefore, cannot be said to have paid for the Part A coverage. Further, appellant maintains that inasmuch as it was compelled to pay taxes which fund Medicare, "[t]he end result of applying the Collateral Source Rule mandates that the appellant must pay again for that which *it has already paid.*"

 Despite these arguments, we believe that the collateral source rule should apply to the payments made to appellant. It is true that in some jurisdictions the collateral source rule applies only when the plaintiff can be said to have purchased the benefit received. *See, e.g., Coyne v. Campbell,* 11 N.Y.2d 372, 183 N.E.2d 891, 230 N.Y.S.2d 1 (1962). The weight of authority, however, is otherwise. *See generally* 25 C.J.S. *Damages* § 99(1), (2), (3) (1966); *Collateral Source Rule: Receipt of Public Relief or Gratuity as Affecting Recovery in Personal Injury Action,* Annot., 77

A.L.R.3d 366 (1977); Notes, *Unreason in the Law of Damages: The Collateral Source Rule,* 77 Harv. L. Rev. 741 (1963–64); J. Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law,* 54 Cal. L. Rev. 1478 (1966). We agree with the majority of courts that application of the collateral source rule need not be conditioned on some payment by the plaintiff for the benefit received. To so limit the doctrine would be contrary to the policy that the wrongdoer should not benefit from collateral payments made to the person he has wronged. *See Thoreson v. Milwaukee & Suburban Transp. Corp.,* 56 Wis. 2d 231, 201 N.W.2d 745 (1972).

Nor do we agree with the contention that application of the collateral source rule would require appellant to pay twice for respondent's injury. While appellant paid taxes into the fund out of which Part A Medicare benefits are paid, those taxes cannot be said to have financed the payments that respondent received. Her benefits were paid by the taxes levied on railroads and railroad workers.

A person can become entitled to Part A coverage by qualifying for social security benefits or by being a "qualified railroad retirement beneficiar[y]." 42 U.S.C § 1395i–1(1). Since respondent is the widow of a "qualified" railroad retiree, she falls into the latter category.

The legislative history of the Medicare act, set forth in the 1965 United States Code Congressional and Administrative News 1943, makes it clear that the financing of payments to different types of beneficiaries is separate and distinct. As stated on page 1946:

> General description.—Basic protection, financed through a separate payroll tax, would be provided by H.R. 6675 against the costs of inpatient hospital services, . . . for social security and railroad retirement beneficiaries when they attain age 65. *Benefits for railroad retirement eligibles would be financed by the railroad retirement tax out of their trust account if certain conditions are met.* The same protection, financed from general revenues, would be provided under a special transitional provision for essentially all people who are

now aged 65, or who will reach 65 in the near future, but who are not eligible for social security or railroad retirement benefits.

(Italics ours.) From the above it is apparent that respondent's Part A benefits were financed by the railroad retirement tax rather than by appellant's taxes. Appellant's argument that it is paying twice is, therefore, without merit.

Even if this were not the case, the fact that appellant paid taxes would not preclude the operation of the rule. A different question might be presented if appellant were a member of a narrow class which made all contributions to a fund and therefore had a "direct, pecuniary interest" in such fund. *See Heath v. Seattle Taxicab Co.,* 73 Wash. 177, 131 P. 843 (1913); *Nelson v. Western Steam Navigation Co.,* 52 Wash. 177, 100 P. 325 (1909). Where the fund is a general one, however, created under a program of social legislation and financed by a tax on employer payrolls, the "contributions" are simply too remote to constitute a "payment" to a person receiving benefits. As the United States Supreme Court indicated in *Eichel v. New York Cent. R.R.,* 375 U.S. 253, 254, 11 L. Ed. 2d 307, 84 S. Ct. 316 (1963):

> "The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers. . . . The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer." *New York, N. H. & H. R. Co.* v. *Leary,* 204 F. 2d 461, 468 [(1st Cir. 1953)], cert. denied, 346 U. S. 856 [98 L. Ed. 370, 74 S. Ct. 71 (1953)].

(Footnote omitted.)

Appellant supplements its arguments by contending that failure to reduce respondent's verdict by the amount of the Part A payments has given her a windfall. We note, however, that to deny application of the rule in this instance would allow appellant the full benefit of the payments from the collateral source. Thus, the real question is not whether there is a windfall, but rather who is to get it. As between

an injured plaintiff and a defendant, we have no hesitation in saying that the former is entitled to prevail. As the court stated in *Grayson v. Williams,* 256 F.2d 61, 65 (10th Cir. 1958):

> Where a part of a wrongdoer's liability is discharged by payment from a collateral source, as here, the question arises who shall benefit therefrom, the wrongdoer or the injured person. No reason in law, equity or good conscience can be advanced why a wrongdoer should benefit from part payment from a collateral source of damages caused by his wrongful act. If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing. We think we may judicially note that notwithstanding that the law contemplates full compensation, incidental losses and handicaps are suffered in a great number of personal injury cases which are not, and cannot be, fully compensated.

We hold that Part A Medicare payment made to respondent is payment from a collateral source and may not be used to reduce the jury's assessment of damages against appellant.

Affirmed.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.