[No. 59064-8. En Banc. January 21, 1993.]

PHANNA K. XIENG, ET AL, *Respondents*, v. PEOPLES
NATIONAL BANK OF WASHINGTON, *Petitioner.*

514

*Miller, Nash, Wiener, Hager & Carlsen, James R. Dickens,* and *Beth M. Andrus,* for petitioner.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *David F. Jurca* and *Laura F. Pasik,* for respondents.

BRACHTENBACH, J. — The trial court found that plaintiff was discriminated against in his employment because of his national origin, a violation of RCW 49.60.180(3). The court entered these *now unchallenged* findings of fact:

> Defendant's reason for not promoting plaintiff to a Credit Authorizer or Loan Officer position was because of plaintiff's foreign accent. . . .
> Plaintiff's accent did not interfere materially with his job performance, nor would it have interfered materially with his job performance as a Credit Authorizer or Loan Officer if he had been promoted to such a position.

Finding of fact 22; Clerk's Papers, at 649-50.

From those *unchallenged* findings, the court entered the following *never challenged* conclusion of law:

> Defendant discriminated against plaintiff in compensation or in other terms or conditions of employment because of national origin, in violation of RCW 49.60.180(3).

Conclusion of law 2; Clerk's Papers, at 652.

The primary issue is whether, despite such findings of fact, the employer has a complete defense to statutorily prohibited employment discrimination if the employer has what defendant describes as a good faith *belief* that the national origin accent would materially interfere with job performance? The answer is no. It would be incongruous for a fact finder to be persuaded that the national origin characteristic would not materially interfere with job performance and, from the same evidence, find that the employer, in fact, in *good faith* and based on substantial evidence held a belief diametrically opposed thereto.

In addition to (1) that primary issue, also at issue are: (2) whether payments made under a disability insurance policy

purchased by the employer can be offset against a judgment obtained by an employee in an employment discrimination action; (3) whether expert witness fees are a proper element of a costs award; and (4) whether a back pay award should be terminated as of the time when the employer eliminates the disputed position. The trial court rejected the employer's request to offset the disability payments, awarded expert witness fees and rejected a cutoff of back pay. The Court of Appeals affirmed the trial court's disposition of each of these issues. *Xieng v. Peoples Nat'l Bank of Wash.*, 63 Wn. App. 572, 821 P.2d 520 (1991). We affirm.

The facts will be briefly summarized here. The trial court's findings of fact are set out in the appendix. The plaintiff employee, Mr. Xieng, is of Cambodian national origin. Mr. Xieng first came to the United States in 1974, when he was sent here from Cambodia for "advanced military training".

When the Cambodian government fell in 1975, Mr. Xieng remained in the United States. After working at several jobs around the country, Mr. Xieng began his employment with Peoples National Bank of Washington (Bank) in 1979. In 1981, Mr. Xieng participated in a management training program the Bank offered for women and minorities. In August 1982, after completing the Bank's management training program, Mr. Xieng was given the position of "loan coordinator".

In performance appraisals completed by Mr. Xieng's supervisors in 1980, 1983, 1984, and 1985, Mr. Xieng was rated "capable of dealing effectively with customers", and each supervisor indicated that Mr. Xieng was presently qualified for promotion. Each appraisal after 1980 referred to communication skills as an area for improvement to maximize his possibilities for future advancement, but even with these suggestions, all but the 1982 appraisal were essentially positive and complimentary. Despite these positive appraisals and the numerous applications submitted by Mr. Xieng, he never received any of the promotions for which he applied. Even after he had performed as a credit authorizer on a

nearly full-time basis for several months, he was not given a promotion to that position.

Finally, on November 18, 1986, Mr. Xieng filed a complaint for employment discrimination against the Bank, alleging that the Bank's failure to promote him constituted national origin discrimination. Mr. Xieng continued his employment with the Bank until he went on full disability leave in August 1987. At that time, he became eligible for disability payments under a disability insurance policy paid for by his employer. Mr. Xieng accepted a $20,000 lump sum settlement from the insurer.

Following the bench trial, the trial court found that Mr. Xieng was qualified for many of the promotions he applied for, that his accent would not have materially interfered with his job performance in the positions for which he applied, and that the Bank's failure to promote him because of his accent constituted national origin discrimination. The trial court's award of $388,982.71 included an award of 3 years of back pay and a costs award which included expert witness fees. The trial court did not offset the disability payments made to Mr. Xieng against the judgment. The Court of Appeals upheld all challenged findings of fact and affirmed all elements of the trial court's judgment.

Before considering the four issues described above, we clarify why there are no issues of fact before the court. In its appeal to the Court of Appeals, all of the Bank's 14 assignments of error were to findings of fact. The Court of Appeals held that all challenged findings of fact were supported by substantial evidence. In its petition for review, the Bank did not challenge the findings of fact. Rather it presented the primary issue as solely one of law, contending that it was entitled to a good faith belief defense. Issues not raised in a petition for review are not considered. RAP 13.7(b) provides in part: "If the Supreme Court accepts review of a Court of Appeals decision, the Supreme Court will review only the questions raised in . . . the petition for review and the

answer, unless the Supreme Court orders otherwise . . .". *See Wood v. Postelthwaite,* 82 Wn.2d 387, 510 P.2d 1109 (1973).

Thus, the following are established facts: (1) that defendant's reason for not promoting plaintiff was because of his "foreign" accent, (2) that plaintiff's accent did not interfere materially with his job performance, and (3) that plaintiff's accent would not have interfered materially with his job performance if he had been promoted to the position for which the court also found he was qualified.

I

Turning to the merits of the primary issue — the good faith belief defense — the analysis must begin with the criteria for establishing a claim of employment discrimination under RCW 49.60.180(3). In defining discriminatory employment practices, RCW 49.60.180 provides in part:

It is an unfair practice for any employer:

. . . .

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin . . ..

■ Recognizing that this provision lacks specific criteria for proving a discrimination claim, we have looked to cases interpreting equivalent federal laws. *E.g., Allison v. Housing Auth.,* 118 Wn.2d 79, 88, 821 P.2d 34 (1991) (retaliatory discharge); *Grimwood v. University of Puget Sound, Inc.,* 110 Wn.2d 355, 356, 753 P.2d 517 (1988) (age discrimination); *Oliver v. Pacific Northwest Bell Tel. Co.,* 106 Wn.2d 675, 678, 724 P.2d 1003 (1986) (race discrimination); *Dean v. Municipality of Metro Seattle,* 104 Wn.2d 627, 636, 708 P.2d 393 (1985) (handicap discrimination). As we explained in *Oliver,* "RCW 49.60 is patterned after Title 7 of the Civil Rights Act of 1964 . . .. Consequently, decisions interpreting the federal act are persuasive authority for the construction of RCW 49.60." *Oliver,* at 678. For the same reason, federal case law is relevant in a case involving a claim of national origin discrimination.

Defendant contends that rejection of the good faith belief standard as a complete defense is contrary to our holdings

in *Grimwood v. University of Puget Sound, Inc.*, *supra*, *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 769 P.2d 298 (1989), and *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 815 P.2d 1362 (1991). As discussed hereafter, *Baldwin* and *Gaglidari* are not employment discrimination cases based on the statute, but rather involved employment termination under an employee handbook or manual. Defendant further argues that unless there is a complete defense of good faith belief, an employer must "prove absolutely" that the employee's accent would have interfered materially with job performance. Petition for Review, at 9. This, it is argued, shifts the burden of proof to the employer contrary to the holding in *Grimwood*, at 363, that the burden of persuasion remains at all times upon the plaintiff. This necessitates an analysis of burdens of production and persuasion.

We have consistently utilized the burden allocation scheme developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). *E.g.*, *Grimwood*, at 361-62.

> Once a plaintiff has made out a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for termination. The employer's burden at this stage is not one of persuasion, but rather a burden of production. To go forward, the employer need only articulate reasons sufficient to meet the prima facie case. Once the employer fulfills [its] burden of production . . . the plaintiff must satisfy his [or her] ultimate burden of persuasion and show that the employer's articulated reasons are a mere pretext for what, in fact, is a discriminatory purpose.

(Citations omitted.) *Grimwood*, at 363-64.

In a case involving a claim of accent-based national origin discrimination, the Ninth Circuit explained the burden the employer must meet once the plaintiff makes a prima facie case. *Fragante v. City & Cy. of Honolulu*, 888 F.2d 591 (9th Cir. 1989), *cert. denied*, 494 U.S. 1081 (1990).

> An adverse employment decision may be predicated upon an individual's accent when — but only when — it interferes materially with job performance. There is nothing improper about an employer making an *honest* assessment of the oral

> communications skills of a candidate for a job when such skills are reasonably related to job performance.

*Fragante*, at 596-97. The court also indicated that the employer must demonstrate a "factual basis" for its assessment of the applicant's communication skills. *Fragante*, at 597. Although the court found that the employer had met its burden, the court added

> a note of caution to the trial courts. Accent and national origin are obviously inextricably intertwined in many cases. It would therefore be an easy refuge in this context for an employer unlawfully discriminating against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communications skills demanded by the job. We encourage a very searching look by the [trial] courts at such a claim.

*Fragante*, at 596.

The Bank argues that, because we have also applied the burden allocation scheme described in *Grimwood* in our *wrongful discharge* cases, the standard we developed for measuring an employer's burden in those cases should be applied in statutorily based *employment discrimination* cases. *See Baldwin v. Sisters of Providence in Wash., Inc., supra.* In *Baldwin*, the employer's burden was dependent on the proper interpretation of contract language providing that employees could only be discharged for "just cause". We interpreted just cause as

> a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. We further hold a discharge for "just cause" is one which is not for any arbitrary, capricious, or illegal reason and which is based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.

*Baldwin*, at 139. In a later wrongful discharge case, we applied a somewhat modified "just cause" requirement to an employment contract that listed specific permissible grounds for termination. *Gaglidari v. Denny's Restaurants, Inc., supra. Without any reference to the burden allocation scheme*, we explained that "the issue is whether at the time plaintiff was dismissed defendant reasonably, in good faith, and

based on substantial evidence believed" that one of the permissible grounds for termination was present. *Gaglidari*, at 438. Relying on *Gaglidari*, the Bank argues that its burden should be to produce evidence that it "reasonably, in good faith, and based on substantial evidence believed" that Mr. Xieng's accent would interfere with his performance of the positions sought.

██ A principle of law, such as applied in *Gaglidari* in a contract setting, does not necessarily and automatically apply in an employment discrimination case where the cause of action is created by a statute. The statute mandates that it be construed liberally for the accomplishment of its declared purposes. RCW 49.60.020. The statute embodies a public policy of "the highest priority". *Allison v. Housing Auth.*, *supra* at 86. In contrast, the common law termination cases represent an evolving area of the law in its departure from the termination-at-will doctrine. *Baldwin*, at 135. The question of breach of contract by the employer in *Gaglidari* was framed as whether the employer "reasonably, in good faith, and based on substantial evidence believed plaintiff" had violated her contract rules of employment. *Gaglidari*, at 438.

The noted rule in *Gaglidari* is appropriate in that kind of a case, but is not suited to a statutory employment discrimination case. Following *Grimwood*, at 363-64, once the plaintiff has made a prima facie case, the employer has the burden of *production* to articulate a legitimate, nondiscriminatory reason for its action. If the employer meets that burden, "the plaintiff must satisfy his ultimate burden of persuasion and show that the employer's articulated reasons are a mere pretext for what, in fact, is a discriminatory purpose." *Grimwood*, at 364.

██ A finding by the trial court that *the* reason for not promoting plaintiff was his accent and that his accent did not and would not interfere materially with job performance is equivalent to a finding of pretext. Such finding is inconsistent with defendant having persuaded the fact finder that it acted reasonably, in good faith and based upon substantial evidence.

Because the Bank's claimed defense necessitates a finding of good faith, reasonably held and based on substantial evidence, it is appropriate to note the trial court's statement in its oral opinion: "And the Court would further find that the reason for the rejection [for promotion] was not worthy of credence. That it was an excuse or a reason that was not a nondiscriminatory reason." Clerk's Papers, at 655.

We have cited *Fragante v. City & Cy. of Honolulu*, 888 F.2d 591 (9th Cir. 1989), *cert. denied*, 494 U.S. 1081 (1990) as persuasive authority. That court noted that the employer must demonstrate "a factual basis" for its evaluation. *Fragante*, at 597. Importantly, the court encouraged "a very searching look" at a claim that it was not the person's national origin which caused the employment or promotion decision because such a claim would be "an easy refuge" for the employer. *Fragante*, at 596. Implicit in the whole tenor of that opinion is a rejection of the notion that a good faith belief, in and of itself, is a defense.

Obviously these allocated burdens are pertinent at various stages of pretrial and trial proceedings. Appellate review requires a different inquiry. As here, the appellate court must determine if the correct principle or standard of law was applied to the facts as found by the trier of fact. However, issues of the respective burdens of the parties, whether production or persuasion, are viewed in a different way.

Once an employment discrimination case has been decided on the merits, any issues concerning the employer's burden merge into the ultimate disposition of the issue of discrimination made by the trier of fact. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16, 75 L. Ed. 2d 403, 103 S. Ct. 1478 (1983); *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 524, 832 P.2d 537 (1992).

> Once all the evidence has been presented, the burden of proof formulation "drops from the case" and the focus of the factfinder is properly on the ultimate issue of discrimination. . . .

Issues of the plaintiff's prima facie case, the employer's burden to rebut with a legitimate nondiscriminatory reason, and the employee's showing of pretext are irrelevant once all the evidence is in.

*Burnside*, at 524 (citing *Aikens*, at 715).

As to findings of fact by the trial court, our role on review is simply to determine whether the trial court's ultimate findings on the issue of discrimination meet the usual standard of review for factual findings. *Anderson v. Bessemer City*, 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985); *Aikens*, at 716. *See also* 2 A. & L. Larson, *Employment Discrimination* § 49.61 (1991). In Washington, that standard is whether the finding is supported by substantial evidence. *See World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991), *cert. denied*, 118 L. Ed. 2d 391 (1992).

Therefore, because we hold that the trial court properly rejected a "good faith belief" as a complete defense, the only way the Bank could challenge the trial court's application of the *Grimwood* burden allocation scheme is by challenging the trial court's factual finding on the issue of discrimination. As noted initially, the present posture of this case does not permit review of the trial court's factual findings. Consequently, the Bank's challenge to the trial court's disposition of the issue of discrimination fails.

## II

The next issue is whether the trial court properly applied the collateral source rule to the disability benefits received by Mr. Xieng under the disability insurance policy paid for by the Bank. The collateral source rule operates to prevent a defendant from receiving the benefit of payments made to a plaintiff from a source independent of the defendant. *Ciminski v. SCI Corp.*, 90 Wn.2d 802, 804, 585 P.2d 1182 (1978). In that case we explained that, in a collateral payment situation, the receipt of a windfall by one party or the other is unavoidable, and that, as between an injured plaintiff and a defendant-wrongdoer, the plaintiff is the appropriate one to receive the windfall. *Ciminski*, at 805-06.

 We have not yet considered the applicability of the collateral source rule to payments made under a disability insurance policy paid for by an employer where the employer is also the defendant. The federal courts have confronted the precise issue involved here. The federal courts have held that the applicability of the collateral source rule depends on whether the employer-funded benefits are in the nature of a fringe benefit of employment or of indemnification for the employer against future liability to its employees. *Folkestad v. Burlington Northern, Inc.*, 813 F.2d 1377, 1381 (9th Cir. 1987). *See also Clark v. Burlington Northern, Inc.*, 726 F.2d 448 (8th Cir. 1984); *Allen v. Exxon Shipping Co.*, 639 F. Supp. 1545, 1547-48 (D. Me. 1986).

> A benefit may be exempt from set-off under the collateral source rule even though the employer is the sole source of the fund. The important consideration is the character of the benefits received, rather than whether the source is actually independent of the employer.

*Clark*, at 450.

> It is clear that the general issue to be resolved is whether payment of the benefits is made pursuant to a plan of the employer to provide for its own indemnification or whether the payment is in the nature of a fringe benefit or deferred compensation.

*Allen*, at 1547-48 (citing *Clark*, at 448).

The federal courts have indicated that the following factors are useful in determining the nature of the benefit:

> (1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

*Phillips v. Western Co. of North Am.*, 953 F.2d 923, 932 (5th Cir. 1992) (quoting *Allen*, at 1548).

Although *Clark* and *Folkestad* both involved employee claims under the Federal Employers' Liability Act (FELA) and both required interpretation of the statutory scheme in the FELA context, other cases make clear that the "nature of the benefit" test is applicable to the common law collateral source doctrine. *See Phillips*, at 930-33 (applying test to collateral source rule in Jones Act case); *United States v. Price*, 288 F.2d 448, 450 (4th Cir. 1961) (applying the test to the collateral source rule in a Federal Tort Claims Act case); *Allen*, at 1547-48 (applying test in non-FELA case). In fact, the rule was initially developed through cases arising in a variety of contexts. *Haughton v. Blackships, Inc.*, 462 F.2d 788, 790-91 (5th Cir. 1972) (seaman's claim for negligence); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 537 (9th Cir. 1962) (seaman's claim for maintenance and cure and for negligence under maritime law and the Jones Act); *Price*, at 450 (Federal Tort Claims Act case).

In addition, the FELA cases themselves indicate that the "nature of the benefit" test is relevant to the common law collateral source rule. *Clark*, at 450 (states the test in explaining the collateral source rule as opposed to the relevant FELA statutory provision); *Brice v. National R.R. Passenger Corp.*, 664 F. Supp. 220, 222 (D. Md. 1987); *Hall v. Minnesota Transfer Ry. Co.*, 322 F. Supp. 92, 95 (D. Minn. 1971) (common law collateral source rule applies to FELA cases subject to the FELA statutory limitation).

> [W]hether the issue is application of the common law collateral source rule or the propriety of a set off under [the relevant FELA provision], the question remains: Is [the benefit] a fringe benefit or a policy of indemnity against liability for on-duty injuries?

*Brice*, at 222.

We agree that the proper test for application of the collateral source rule is the nature of the disability benefits. If the disability benefits are a fringe benefit of employment, the collateral source rule applies to prevent an offset. Our decision is consistent with decisions in other states applying

similar versions of the "nature of the benefit test". *Stachur-ski v. K Mart Corp.*, 180 Mich. App. 564, 572, 447 N.W.2d 830, 834 (1989) (personal injury action based on theories of products liability and negligence); *Tarrant Cy. Waste Disposal, Inc. v. Doss*, 737 S.W.2d 607, 611 (Tex. Ct. App. 1987) (negligence action for personal injury). We also agree that the factors listed in *Allen* are helpful, but we do not adopt them as exclusive.

██ ██ Because the trial court did not make a finding as to the nature of the disability policy in this case, we must treat the case as though a finding of fact against the party with the burden of proof was made. *See Golberg v. Sanglier*, 96 Wn.2d 874, 880, 639 P.2d 1347, 647 P.2d 489 (1982). In order to do this, we must first determine which party had the burden of proof on this issue. As with other issues raised by the Bank in an attempt to reduce or mitigate their damages, the burden of proof on this issue should be placed on the Bank. *See Smith v. King*, 106 Wn.2d 443, 451, 722 P.2d 796 (1986).

The Bank has failed to meet its burden on this issue. The Bank failed to offer any evidence that the disability insurance was intended to indemnify the Bank. In fact, the only evidence concerning the nature of the disability insurance was an admission by the Bank's assistant vice-president and employee relations officer that the disability insurance policy was a fringe benefit of Mr. Xieng's employment. Therefore, we treat this case as though the trial court made a finding that the disability insurance policy was a fringe benefit of Mr. Xieng's employment. Accordingly, the trial court correctly applied the collateral source rule and disallowed the Bank's requested offset for the disability benefits.

## III

The third issue is whether the trial court properly included expert witness fees in its costs award. RCW 49.60-.030(2), the remedial provision of RCW 49.60, provides:

Any person deeming himself injured by any act in violation of this chapter shall have a civil action in a court of competent

jurisdiction to enjoin further violations, to recover the actual damages sustained by him, or both, together with the cost of suit including a reasonable attorney's fees or any other remedy authorized by this chapter or the United States Civil Rights Act of 1964 . . ..

Our previous cases discussing the proper scope of a costs award under RCW 49.60.030(2) are in conflict. *Compare Blair v. WSU*, 108 Wn.2d 558, 740 P.2d 1379 (1987) *with Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 709 P.2d 799 (1985). In *Shannon* we held that the scope of "cost of suit" under RCW 49.60.030(2) is the same as the scope of "costs" under RCW 4.84.030, our general costs provision. Based on that holding, we denied an award of expert witness fees because such an award is not authorized under RCW 4.84-.030. *Shannon*, at 736. Although in *Blair* we did not expressly consider whether expert witness fees are within the scope of RCW 49.60.030(2), we did hold that RCW 4.84 does not limit the scope of RCW 49.60.030(2), and expert witness fees were a part of the trial court's costs award which we upheld.

As with other provisions of RCW 49.60, federal authority is relevant in interpreting our costs provision. *Blair*, at 572-73. Consideration of the federal cases confronting the issue of the availability of expert witness fees demonstrates that in the past there was similar conflict among the federal courts.

In 1987, the United States Supreme Court held that expert witness fees were not recoverable under the general costs statute, 28 U.S.C. § 1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 96 L. Ed. 2d 385, 107 S. Ct. 2494 (1987). However, *Crawford* did not have the effect of making expert witness fees unavailable in all cases. Other cases had awarded expert witness fees as part of attorney fees under 42 U.S.C. § 1988. *E.g., Bruno v. Western Elec. Co.*, 618 F. Supp. 398 (D. Colo. 1985), *aff'd in part, rev'd in part on other grounds*, 829 F.2d 957 (10th Cir. 1987). In 1991, the United States Supreme Court eliminated this option by holding that expert witness fees cannot be awarded as part

of costs or as part of attorney fees unless expressly provided for by statute. *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 113 L. Ed. 2d 68, 111 S. Ct. 1138 (1991). Later in 1991, the Civil Rights Act of 1991 amended 42 U.S.C. § 2000e-5(k), the attorney fees provision for employment discrimination cases, to expressly allow for an award of expert witness fees as part of the attorney fees element of costs. Pub. L. No. 102-166, § 113(b), 105 Stat. 1071, 1079.

It is clear that RCW 49.60.030(2) would now permit an award of expert witness fees as a remedy explicitly "authorized by . . . [§ 2000e-5(k) of] the United States Civil Rights Act of 1964", as amended by the Civil Rights Act of 1991. Thus, as to employment discrimination claims brought under RCW 49.60.180(3) after the enactment of the amendment to § 2000e-5(k) on November 21, 1991, an award of expert witness fees is clearly authorized by RCW 49.60-.030(2). However, the trial in the present case took place before November 21, 1991. The issue, then, is whether the amendment to § 2000e-5(k), as part of the Civil Rights Act of 1991 (Act), should be applied to cases that were pending on appeal at the time the amendment was enacted.

The federal courts that have considered whether the Act should be applied to cases pending at the time of enactment are divided both as to result and rationale. *See, e.g., Davis v. City & Cy. of San Francisco*, 976 F.2d 1536 (9th Cir. 1992) (holding that congressional intent to apply the Act, including the amendment to § 2000e-5(k), to pending cases is clear from the statutory language); *Mozee v. American Comm'l Marine Serv. Co.*, 963 F.2d 929 (7th Cir.) (holding not retroactive based on a presumption), *cert. denied*, 121 L. Ed. 2d 148 (1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir. 1992) (holding not retroactive based on a presumption); *Vogel v. Cincinnati*, 959 F.2d 594 (6th Cir.) (holding not retroactive based on a presumption), *cert. denied*, 121 L. Ed. 2d 49 (1992).

The most convincing rationale and the rationale we adopt is that of the Ninth Circuit in *Davis*. The Ninth

Circuit recognized, as have the other circuits, that the United States Supreme Court has given somewhat conflicting guidance concerning when legislation should be applied retroactively. *See Bradley v. School Bd.*, 416 U.S. 696, 711, 40 L. Ed. 2d 476, 94 S. Ct. 2006 (1974) (stating that legislation applies to pending cases unless application "would result in manifest injustice or there is statutory direction or legislative history to the contrary"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 102 L. Ed. 2d 493, 109 S. Ct. 468 (1988) (stating that legislation should be applied retroactively only when the "language requires this result"). The Ninth Circuit, following a third United States Supreme Court opinion, *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 108 L. Ed. 2d 842, 110 S. Ct. 1570 (1990), found it unnecessary to resolve this conflict. In *Bonjorno*, the Court explained that, "where the congressional intent [concerning retroactivity] is clear, it governs," and resort to a presumption is unnecessary. *Davis v. City & Cy. of San Francisco*, 976 F.2d 1536, 1550 (9th Cir. 1992) (quoting *Bonjorno*, at 837).

The *Davis* court was presented with the precise issue of whether to apply the amendment to § 2000e-5(k) to the case before it, which was pending at the time of enactment of the amendment. The court found that the congressional intent concerning the retroactivity of the Act, including the amendment to § 2000e-5(k), was clear from the statutory language. *Davis*, at 1550. The court pointed to the language in sections 109(c) and 402(b) of the Act explicitly making certain provisions applicable prospectively only. Civil Rights Act of 1991, Pub. L. No. 102-166, § 109(c), 105 Stat. 1071, 1078 ("The amendments made by this section shall not apply with respect to conduct occurring before the date of enactment of this Act."); Civil Rights Act of 1991, Pub. L. No. 102-166, § 402(b), 105 Stat. 1071, 1099 ("[N]othing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."). Relying on

the rule of construction that "a statute should be interpreted so as not to render one part inoperative," *Davis*, at 1551 (quoting *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22, 90 L. Ed. 2d 490, 106 S. Ct. 2039 (1986) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392, 58 L. Ed. 2d 596, 99 S. Ct. 675 (1979))), the court explained that the only way these provisions possess any meaning is if the rest of the Act is intended to be applied to cases pending at the time of enactment. *Davis*, at 1551. The court recognized that the intent ascertained from the statutory language can be over-ridden by clear evidence of a contrary intent in the legislative history. *Davis*, at 1553. After considering the limited legislative history, comprised primarily of floor statements made by individual congresspersons, the court found that no such clear evidence existed in this case. *Davis*, at 1555. *See also Mozee v. American Comm'l Marine Serv. Co.*, 963 F.2d 929, 941 (7th Cir. 1992) (Cudahy, Circuit Judge, dissenting) ("Given the general lack of information, we should give effect to the only direction Congress has provided: if section 109 is to apply prospectively, the rest of the Act is retroactive").

We are persuaded that the Ninth Circuit acted consistently with the pronouncements of the United States Supreme Court concerning statutory interpretation in reaching the conclusion that Congress intended the Act to be applied to cases pending at the time of enactment. Therefore, 42 U.S.C. § 2000e-5(k) of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 is applicable to this case, and the trial court's award of expert witness fees to Mr. Xieng was proper under RCW 49.60.030(2). Given this conclusion, we need not resolve any conflict between *Blair v. WSU*, 108 Wn.2d 558, 740 P.2d 1379 (1987) and *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 709 P.2d 799 (1985).

IV

The final issue is whether a back pay award must be adjusted when an employer eliminates the position sought by the employee plaintiff. RCW 49.60.030(2), which defines the scope of remedies available under RCW 49.60, provides:

> Any person deeming himself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover the actual damages sustained by him, or both, together with the cost of suit including a reasonable attorney's fees . . ..

We have interpreted RCW 49.60.030(2) as authorizing an award of back pay. *See Davis v. Department of Labor & Indus.*, 94 Wn.2d 119, 127, 615 P.2d 1279 (1980). We have not yet considered how the elimination of the position to which a plaintiff would have been promoted absent the employer's discrimination affects an award of back pay.

As discussed above, in the absence of adequate state authority, federal authority is persuasive in interpreting RCW 49.60. Where an employer claims that a back pay award should be cut off as of the time the position sought or previously held by the plaintiff was subsequently eliminated, the federal courts place the burden on the employer to show "that plaintiff would not have been retained in some other capacity." *Archambault v. United Computing Sys., Inc.*, 786 F.2d 1507, 1515 (11th Cir. 1986). *See also Meschino v. International Tel. & Tel. Corp.*, 661 F. Supp. 254, 257 (S.D.N.Y. 1987). Similarly, in a case where the plaintiff's successor continued his employment with the employer after the plaintiff's former position was eliminated, the court held that the time of elimination of the position was not the proper time to terminate the back pay period. *Hill v. Spiegel, Inc.*, 708 F.2d 233, 238 (6th Cir. 1983). *See also Gaddy v. Abex Corp.*, 884 F.2d 312, 319 (7th Cir. 1989) (holding that a cutoff of back pay as of the time of the sale of the employer's business was not appropriate where other employees in plaintiff's former department were retained by the purchaser).

A statement by a federal court in the context of a front pay award is consistent with this approach.

> [C]ourts will presume for the purposes of awarding relief that an illegally discharged employee would have continued working for the employer until he or she reaches normal retirement age, unless the employer provides evidence to the contrary.

*MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1060 (8th Cir. 1988). More generally, a Federal District Court has

stated that "[a] general reduction in the workforce, however, is not a valid defense to a claim of front pay." *Sims v. Mme. Paulette Dry Cleaners*, 638 F. Supp. 224, 233 (S.D.N.Y. 1986).

Because this argument represents another attempt by the Bank to reduce its damages, it is analogous to a mitigation of damages issue, and we agree with the federal courts that the employer should bear the burden to demonstrate that the plaintiff would not have been shifted to another position after the elimination of the position for which the plaintiff applied. *See Smith v. King*, 106 Wn.2d 443, 451, 722 P.2d 796 (1986) (stating that the burden of proof for mitigation of damages issues is on the defendant).

The Bank did not meet its burden in this case. The only evidence relied upon by the Bank as proof that Mr. Xieng would not have been retained in a different position is the testimony of the Bank's assistant vice-president and employee relations manager. He testified that the credit authorizer position was eliminated in 1988 and that Mr. Xieng would have been "displaced" after the elimination of the credit authorizer position. The witness also explained that by "displaced", he meant laid off. However, the witness did not indicate whether all employees holding credit authorizer positions were laid off or whether some were retained in other positions. Specifically, the witness failed to explain what happened to the employee who was given the credit authorizer position that Mr. Xieng might have occupied absent the Bank's discrimination. Moreover, the same witness, when called by the plaintiff, admitted that U.S. Bank, the successor to the Bank, had an equivalent position called "branch loan assistant". Therefore, the Bank did not present the evidence required to justify an adjustment to Mr. Xieng's back pay award. We affirm the trial court's award of back pay.

Our final consideration is whether Mr. Xieng is entitled to attorney fees on review. Mr. Xieng has requested attorney fees on review pursuant to RAP 18.1 and RCW 49.60.030(2). RAP 18.1 provides for an award of attorney

fees on review where a statute authorizes such an award. RCW 49.60.030(2) does not expressly provide for attorney fees on review, but it has been interpreted as authorizing such an award. *Allison v. Housing Auth.*, 118 Wn.2d 79, 98, 821 P.2d 34 (1991). Therefore, provided that all requirements of RAP 18.1 are satisfied, we award attorney fees on review to Mr. Xieng in an amount to be calculated by the commissioner under RAP 18.1(f).

APPENDIX

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

PHANNA K. XIENG,

 Plaintiff,

 v.

PEOPLES NATIONAL BANK OF WASHINGTON,

 Defendant.

NO. 86-2-24811-1

AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

. . . .

1. Defendant Peoples National Bank of Washington was acquired by U.S. Bancorp in January 1988. Since that time U.S. Bank of Washington, N.A., a wholly owned subsidiary of U.S. Bancorp, had succeeded to the rights, responsibilities and obligations of defendant Peoples National Bank of Washington.

2. At all relevant times defendant did business in King County, Washington and had eight or more employees.

3. Plaintiff was born in 1949 in Cambodia and was educated there, receiving a degree of Bachelor of Arts in Federal Administration from Battambang University in Cambodia, where, among other things, he was elected president of the student body. Plaintiff's father was a professor at the university.

4. Following his graduation from college in 1969, plaintiff studied for a year at the Sorbonne in Paris, received training as a foreign naval officer at the French Naval School in Brest, France, served briefly as an Assistant to the Charge d'Affaires at the Cambodian Embassy in Seoul, Korea, served briefly in the Office of the Governor of Phnom Penh, and studied public affairs and administrative law at the National Institute

of Public Affairs in Phnom Penh in 1971-72 and economics, finance and law at the National Institute of Law in Phnom Penh in 1972-74.

5. As a naval officer in the Cambodian Military Service, in 1974 plaintiff was sent to the United States for advanced military training in conjunction with the joint defense of Indochina. Plaintiff attended the United States Military School for command officers at Lackland Air Force Base in Texas and at San Diego Naval Base in California. In February 1975 plaintiff was awarded a diploma for successful completion of the American Language Course at the English Language School of the Defense Language Institute. He also received American military training as an air and sea rescue pilot for amphibious forces, including courses in gunnery, underwater demolition, landing craft beach and surf salvage, and first aid and general damage control. All of this training was conducted in English.

6. In 1975, while plaintiff was stationed at the San Diego Naval Base, Pol Pot and Khmer Rouge overthrew the Cambodian government and embarked on genocidal atrocities in Cambodia. Plaintiff subsequently learned that all other members of his family were killed in Cambodia by the Pol Pot regime. When the Cambodian government fell, plaintiff was released from further military training at the San Diego Naval Base and, unable to return to Cambodia, he was left stranded in the United States.

7. Following his release from military training in 1975, plaintiff traveled across the United States, working at assorted odd jobs, and ended up in Washington, D.C. He attended the Lewis International School there and obtained a diploma in Hotel and Restaurant Management in March 1976. While in Washington, D.C., he met his wife-to-be, Bathou, also of Cambodian origin, whose parents had been attached to the Cambodian embassy. Plaintiff traveled back to the West Coast and worked for a while for American Airlines in Los Angeles. In 1978 he moved to the Seattle area, where Bathou joined him and the two were married. They now have two children.

8. In 1978 Plaintiff entered a Skipper's Fish and Chips management training course, and in six months he became an assistant manager. Four months later he was promoted to manager of a Skipper's Seafood and Chowder House restaurant in Kirkland, where he was responsible for all phases of restaurant management and operations.

9. In 1979, in what plaintiff hoped would be a significant career advancement, he applied for a job with defendant in response to a newspaper ad. Following an oral interview that was part of the employment application process, plaintiff was hired by the defendant in June 1979 as a vault and payroll teller.

10. In 1981 plaintiff was one of 20 employees selected to participate in a special management training program for women and minorities.

The program was instituted by the defendant pursuant to an EEOC consent decree to settle certain discrimination charges. The program covered most areas of banking operations and management. As part of the selection process for the program, plaintiff was interviewed orally. One of the selection criteria was that the applicant was to describe a realistic training goal. Plaintiff's stated goal was to be trained as a loan officer.

11. In May 1981 the defendant awarded plaintiff with certificates for successful completion of teller training programs called the "Tel-Five Training Program" and the "Customer Satisfaction Program," and in June 1982 plaintiff successfully passed an American Institute of Banking course in Effective English.

12. In August 1982 plaintiff was transferred to the defendant's Consumer Credit Department, as a "Loan Coordinator," working first with student loans and then with other kinds of consumer credit. The Loan Coordinator position had a salary level of "grade 9" under the defendant's structure of graded job levels. Plaintiff's salary level remained at grade 9 throughout the rest of his employment with the defendant.

13. From time to time plaintiff's supervisors filled out formal written "performance appraisals" of him. In a June 1983 performance appraisal his supervisor indicated that plaintiff was "now" qualified to advance to a lending officer (grade 14) or operations supervisor position. In July 1984 his supervisor wrote that "with your operations and lending background, you are qualified to advance to a consumer lending officer [or] operations supervisor position, . . ."

14. Later in July 1984 his supervisor wrote:

"Phanna is a very hardworking individual who's [sic] quantity and quality of work is always high. Besides being an excellent worker, he works well with both staff and customers. His personality and sense of humor is a welcome respite in the often stressful and high volume area of student loans. He is a definite asset to the department."

15. In a written performance appraisal in November 1985 his supervisor wrote, in describing a position that plaintiff was "now" qualified to advance to, as follows: "With his experience in student loans and currently; a position I would recommend: Credit Authorizer." The Credit Authorizer position had a grade 11 salary level. His supervisor also indicated that with continued job experience and development plaintiff could advance to a Loan Officer (grade 14) position.

16. The written performance appraisals of other employees promoted to positions plaintiff applied for contained comments for how the particular employee could improve his or her performance. The performance appraisals of plaintiff recited that he had problems with oral communication and recommended that he take English classes.

17. In March 1986 plaintiff began filling in from time to time as a Credit Authorizer, and from the beginning of June 1986 until the end of the year he "filled in" virtually full time as a Credit Authorizer, except for limited periods when he was assigned to the "Fair Isaac" credit scoring program. Although plaintiff "filled in" as a Credit Authorizer (grade 11) for most of 1986, defendant continued to pay him at a grade 9 salary level. In the fall of 1986 plaintiff expressed continuing interest in being promoted to the next Credit Authorizer position that became available. At that time his supervisor, Wanda Judd, told him he would be promoted automatically to that position when it next became available. Although his supervisor in 1986 had promised him that he would be promoted "automatically" as soon as the next Credit Authorizer position became available, when the Credit Authorizer position was filled permanently in early 1987 the promotion went to someone less qualified than plaintiff.

18. The absenteeism constituting the major complaint by one of plaintiff's supervisors, Wanda Judd, in her written performance appraisal of plaintiff for the period November 1985 to February 1987 occurred during the time plaintiff was becoming depressed and consequently physically ill from the defendant's failure to promote him.

19. On one occasion a managerial level supervisor threw plaintiff's application for a promotion, or his resumé, into his wastebasket as soon as plaintiff left his office. On another occasion another managerial level supervisor told the plaintiff he would get the promotion he was seeking if he could "guarantee" that he could persuade everyone in Seattle's Cambodian community to become customers of the Bank; when plaintiff explained that it would be impossible for him to guarantee such a thing, the promotion went to someone else.

20. Plaintiff was well qualified for the job of Credit Authorizer (grade 11), Loan Officer (grade 14), and other positions for which he applied, despite his Cambodian accent. Not only did a number of his supervisors and fellow workers recognize this fact, but plaintiff actually performed the Credit Authorizer job — on a supposedly "fill-in" basis but actually on a virtually full-time basis — for most of 1986, yet the defendant refused to promote him to that position and continued to pay him at the lesser grade 9 salary level.

21. On numerous occasions from 1982 through 1985 plaintiff applied for promotion to various positions higher than grade 9 for which the defendant had openings, including the positions of Credit Authorizer and Loan Officer. The defendant did not promote plaintiff to any of these positions.

22. Defendant's reason for not promoting plaintiff to a Credit Authorizer or Loan Officer position was because of Plaintiff's foreign accent.

Although the plaintiff does have an accent, he clearly has a thorough comprehension of the English language. He can speak the English language and be understood, and he can understand what others tell him in English. Plaintiff's accent did not interfere materially with his job performance, nor would it have interfered materially with his job performance as a Credit Authorizer or Loan Officer if he had been promoted to such a position.

23. By refusing to promote plaintiff to the higher positions for which he applied or to which he was assured he would be promoted automatically, on the ground of his Cambodian accent, the defendant actually was discriminating against him on the basis of his national origin.

24. Plaintiff became a naturalized U.S. citizen in March 1986.

25. Beginning in late 1985, as a proximate result of being passed over repeatedly for promotions after being led to believe that he would be promoted, plaintiff began suffering severe emotional distress and severe depression, which in turn depressed his body's auto-immune system and caused him to suffer a number of debilitating illnesses, such as chronic active hepatitis, inflammation of the liver, Sjogren's Syndrome and Epstein-Barr Virus Syndrome. He began seeing doctors in many different specialties, including a psychiatrist, in an attempt to deal with the mental and physical problems resulting from the defendant's actions.

26. Plaintiff went on full disability leave from the defendant as of August 14, 1987. His disability from employment was proximately caused by the defendant's discriminatory actions.

27. Plaintiff's full disability from employment has continued from August 14, 1987 to the present. His disability will probably continue for another five years from the date of the court's oral decision, but with the course of medical treatment recommended by his psychiatrist he should be able to become employable again at that time.

28. As a result of the defendant's discriminatory actions, plaintiff has lost "back pay," since he went on disability leave in August 1987, in the amount of salary he would have earned from that date to the present if he had been promoted to the Credit Authorizer position. The amount of such "back pay" would have been approximately $8,231 in 1987, $23,425 in 1988, $24,900 in 1989, and $10,375 in the first five months of 1990, or a total of $66,931 through the end of May 1990. This back pay amount is a liquidated sum, based on the defendant's salary scale for the grade 11 Credit Authorizer position. The amount of prejudgment interest owing on the liquidated sum representing back pay is approximately $13,303.26.*

---

*The figures were handwritten in the original.

29. As a result of the defendant's discriminatory actions, plaintiff has lost five years of "future pay," that is, compensation he would have earned as a Credit Authorizer, for five years after the date of the court's oral decision, if he had not been disabled. The amount of this lost "future pay," adjusted for probable inflation and future wage increases and discounted to present value, including an estimated 15% markup for fringe benefits, is approximately $143,175.

30. As a result of the defendant's discriminatory actions, plaintiff will require a course of future medical and psychiatric treatment to deal with the health problems caused by the defendant and to return him to employable status. Such future medical and psychiatric treatment will cost approximately $15,000.

31. In addition to the foregoing damages representing lost back pay, lost future pay, and the course of future medical treatment, plaintiff's damages resulting from the defendant's discriminatory actions include a total of $50,000 for past, present and future severe mental distress and physical pain and suffering.

32. ~~As determined by the court in a separate order awarding plaintiff attorney fees and expenses pursuant to RCW 49.60.030(2), p~~Plaintiff has incurred reasonable attorney fees in this action in the amount of $89,648.00* and reasonable expenses in the amount of $10,800.45*.

DORE, C.J., and UTTER, DOLLIVER, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.